# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-DP-01218-SCT

*WILLIAM MATTHEW WILSON a/k/a WILLIE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/30/2007 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL DEFENSE COUNSEL |
| | BY: ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT McNAMARA |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 09/24/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1. After being indicted by a Lee County grand jury on the charges of capital murder and felonious child abuse, William Matthew Wilson pleaded guilty in Lee County Circuit Court to both counts in the indictment. Wilson also waived a sentencing hearing before a jury; thus, after a sentencing hearing before the trial judge, Wilson was sentenced to death by lethal injection for capital murder, and to serve a twenty-year sentence for felonious child

abuse. Wilson has appealed, attacking the sentence of death imposed pursuant to his conviction for capital murder. Finding no error, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. On April 29, 2005, two-year-old Malorie Conlee was airlifted from her home and transported to North Mississippi Medical Center in Tupelo, where she subsequently was pronounced dead due to a closed head injury. Malorie had been living in a mobile home in the Mooreville area with her mother, Augustina Conlee[1] and her mother's boyfriend, William Matthew Wilson. At the hospital, Wilson first told law enforcement officials that Malorie had sustained the head injury when his motorcycle fell on her. The examining physician at North Mississippi Medical Center determined that the injuries were more consistent with child abuse.

¶3. Wilson subsequently gave the following account of Malorie's symptoms and behavior to law enforcement officials. Wilson stated that on the previous day, Malorie had been making irregular, convulsive movements and had exhibited a soft spot on her head that he described as "mushy." He also stated that only one of Malorie's eyes would dilate when exposed to a flashlight. Wilson admitted that he and Augustina had failed to seek medical attention for Malorie due to his fear that bruising he had inflicted on Malorie's cheeks would be discovered. He further stated that Malorie had been vomiting that evening. When asked about the burns on Malorie's feet, Wilson stated that these burns had been sustained

---

[1]Augustina Conlee also is referred to in the record as Augustina Conner.

previously when Malorie had been left unattended in the bathtub. Wilson gave essentially this same account to law enforcement officials when interviewed again at the Lee County Sheriff's Office. Later, in yet another interview, after being confronted with the fact that a search of the premises revealed that the motorcycle appeared to be basically untouched and covered in cobwebs, Wilson told law enforcement officials that Malorie's head injury had been sustained after he had dropped her on the kitchen floor. Prior to giving each of these statements, Wilson was given *Miranda* warnings.[2]

¶4.     In an interview with law enforcement officials, Conlee admitted that Wilson had told her he had hit Malorie in the head and had choked her. In a subsequent interview, Wilson confessed that he had hit Malorie in the head with his fist three times. According to Wilson, Malorie was then put to bed on a pallet on the floor, where Wilson reported she had made irregular movements with her arms, and that she had cried and moaned. Wilson further stated that he had gone to sleep and, upon waking in the early morning hours of April 29, 2005, he had discovered that Malorie was unresponsive and blue in color, and that he had finally called 911.

¶5.     On July 19, 2005, Wilson was indicted by the Lee County Grand Jury for capital murder while engaged in the commission of felonious abuse of a child committed on or about April 29, 2005 (Count I)[3], and felonious child abuse of a child committed on or about January

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3]Miss. Code Ann. § 97-3-19(2)(f) (Rev. 2006).

19, 2005 (Count II).[4] Prior to the trial date, Wilson entered into a plea agreement with the prosecution whereby the State, in exchange for guilty pleas from Wilson on both counts in the indictment, would recommend a life sentence without parole as to Count I, in lieu of the death penalty, and a sentence of twenty years as to Count II, with the second sentence to run consecutively with the first sentence.

¶6. On March 5, 2007, the Circuit Court of Lee County, Judge Thomas J. Gardner, III presiding, conducted a plea hearing. During the plea colloquy, Wilson expressed dissatisfaction with his appointed counsel. As a result, the trial judge refused to accept his pleas of guilty, and Wilson was returned to the custody of the Lee County Sheriff.

¶7. On May 24, 2007, Judge Gardner reconvened court to consider Wilson's renewed interest in entering guilty pleas on both counts in the indictment. The prosecution informed the trial court and Wilson (and Wilson's counsel) that the State had withdrawn its previous sentencing recommendation of life without parole plus twenty years, and that the State would once again seek the death penalty on the capital murder charge. During this second guilty plea colloquy, Wilson informed the trial court that he was satisfied with the performance of his appointed counsel. After the trial court conducted an extensive examination of Wilson regarding the voluntariness of his guilty pleas, the pleas were accepted on both counts of the indictment, and a sentencing hearing was scheduled for May 29, 2007. The sentencing phase was conducted without a jury as Wilson previously had waived his right to a jury, both orally

---

[4]Miss. Code Ann. § 97-5-39(2)(a) (Rev. 2006).

4

and in writing. The prosecution and the defense presented witnesses and arguments to the court during the sentencing proceedings. At the conclusion of the sentencing hearing, Judge Gardner entered a sentencing order on May 30, 2007.

¶8. The trial judge found beyond a reasonable doubt that, pursuant to Mississippi Code Section 99-19-101(7), Wilson killed Malorie Conlee, based on the fact that Wilson confessed to having done so and based upon the testimony of the pathologist, Dr. Hayne. Moreover, the trial judge found beyond a reasonable doubt that the following aggravating circumstances existed: (1) the killing of Malorie Conlee was committed while in the commission of felonious child abuse; (2) the capital offense was especially heinous, atrocious, and cruel due to the child's age, small stature, inability to defend herself, nature of the injuries inflicted by Wilson, and the amount of time in which Malorie suffered due to the failure of Wilson and Malorie's mother to seek medical treatment for her. *See* Miss. Code Ann. §§ 99-19-101(5)(d), 99-19-101(5)(h) (Rev. 2007). The trial judge found the following mitigating factors: (1) the defendant had no significant criminal history, and (2) the defendant was twenty-four years old at the time of the occurrence. *See* Miss. Code Ann. §§ 99-19-101(6)(a), 99-19-101(6)(g) (Rev. 2007). The trial court found that the aggravating circumstances outweighed the mitigating circumstances; thus, the trial court imposed a sentence of death for the capital murder conviction. On June 7, 2007, Wilson filed a post-trial "Motion for Judgment of Acquittal JNOV as to Sentence or in the Alternative for a New Penalty Phase Trial." The trial court denied Wilson's motion on June 18, 2007.

**DISCUSSION**

5

¶9.     This Court reviews capital murder cases in which the defendant has been sentenced to death with "heightened scrutiny." *Loden v. State*, 971 So. 2d 548, 562 (Miss. 2007) (citing *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992)). "Under this method of review, all genuine doubts are to be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005) (quoting *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978)). *See also Fisher v. State*, 481 So. 2d 203, 211 (Miss. 1985).

¶10.    Wilson raises five assignments of error for this Court's review: (1) whether the trial court abused its discretion and arbitrarily refused to accept the first guilty plea on March 5, 2007, thus preventing Wilson from accepting the plea-bargain agreement for life imprisonment, or in the alternative, Wilson was denied effective assistance of counsel that resulted in his loss of the enforcement of the original plea-bargain agreement, all in violation of the state and federal constitutions; (2) whether the prosecution committed misconduct by improperly cross-examining a mitigation witness, thus depriving Wilson of a fundamentally fair sentencing hearing; (3) whether the admission of testimony by Dr. Hayne was improper and a result of ineffective assistance of counsel; (4) whether the victim impact testimony was improper and in violation of Wilson's constitutional rights; and (5) whether cumulative error requires reversal of Wilson's conviction and death sentence.

¶11.    Wilson's Brief of Appellant and Reply Brief of Appellant make it clear that Wilson is attacking on direct appeal only the death sentence imposed upon him in Count I of the indictment. Furthermore, Wilson's counsel, at oral argument, emphasized that the twenty-

year sentence imposed in Count II was not before the Court in this appeal. Thus, we focus

our attention today on the sentence of death imposed upon Wilson.

I.  **WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO ACCEPT WILSON'S ORIGINAL GUILTY PLEA, OR IN THE ALTERNATIVE, WHETHER INEFFECTIVE ASSISTANCE OF COUNSEL RESULTED IN THE LOSS OF THE BENEFIT OF WILSON'S ORIGINAL PLEA AGREEMENT.**

¶12.    Wilson argues that the trial court arbitrarily rejected his guilty plea due to his having

expressed dissatisfaction with his appointed counsel. In the alternative, Wilson contends that

his trial counsel rendered ineffective assistance due to lack of communication between

attorney and client, causing Wilson to lose the opportunity to be sentenced to life

imprisonment pursuant to the original plea agreement. The State contends that Wilson is

statutorily barred from appealing the validity of his guilty plea. *See* Miss. Code Ann. §

99-35-101 (Rev. 2007);[5] *see also **Loden v. State***, 971 So. 2d 548, 561 (Miss. 2007) (validity

of guilty plea may not be challenged on direct appeal). Stated differently, the State contends

that Wilson is attempting to "back-door" an attack on the May 24, 2007, guilty plea accepted

---

[5]Prior to July 1, 2008, Mississippi Code Section 99-35-101 stated: "Any person convicted of an offense in a circuit court may appeal to the supreme court, provided, however, an appeal from the circuit court to the supreme court shall not be allowed in any case where the defendant enters a plea of guilty." *See **Johnson v. State***, 925 So. 2d 86, 88 n.1 (Miss. 2006) (under pre-2008 statute, appellate court could address via direct appeal issue of length of defendant's sentence subsequent to guilty plea). On the other hand, as of July 1, 2008, an amended Mississippi Code Section 99-35-101 (Supp. 2008) states: "Any person convicted of an offense in a circuit court may appeal to the Supreme Court. However, where the defendant enters a plea of guilty and is sentenced, then no appeal from the circuit court to the Supreme Court shall be allowed."

7

by the trial court by asserting that the trial court should have accepted his March 5, 2007, guilty plea so that he could reap the benefit of the life-without-parole offer to which he and the State had agreed by way of a sentence recommendation.

¶13.    However, all of this is of no moment, because even assuming *arguendo* that Wilson is attempting to attack on direct appeal his May 24, 2007, guilty plea, we still would be required to consider the sentence-related issues arising out of Wilson's May 24, 2007, guilty plea. *Loden*, 971 So. 2d at 561. Additionally, Mississippi Code Section 99-19-105(1) (Rev. 2007) states in pertinent part: "Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence ***shall*** be reviewed on the record by the Mississippi Supreme Court." (emphasis added). Thus we are duty-bound to review this issue on direct appeal.

¶14.    Turning to the issue before us, the transcript of the March 5, 2007, plea hearing colloquy with the trial judge reveals in pertinent part:

> Q.    Mr. Wilson, are you satisfied with the legal services and the advice given you by your attorneys?
> A.    No, sir.
> Q.    You are not?
> A.    No, sir.
> Q.    Very well. In what regard?
> A.    I feel like there could have been more done. I don't think I can receive a fair trial. That's why I'm taking this plea.
> Q.    Mr. Wilson, one of the responsibilities that I have is to ensure that you do get a fair trial.
> A.    Yes, sir.
> Q.    And I will do all within my power to see that that is done.
> A.    Yes, sir.

8

Q.  Now, if you tell me that you are not satisfied with the services that your attorneys have given you, I'm not going to accept your plea. You have just got (sic) through telling me that.

A.  Yes, sir. I'm not totally satisfied, no, sir I'm not.

**THE COURT**: Well, all right. Mr. Wilson, I'm returning you to the custody of the (sic) Lee County. This matter will be placed on the docket for trial at a later time.

¶15.  "[A] criminal defendant has no absolute right to have his guilty plea accepted by a trial court." ***Moody v. State***, 716 So. 2d 592, 594 (Miss. 1998).  The trial judge's decision to accept or reject a plea is within the exercise of sound judicial discretion.  ***Wade v. State***, 802 So. 2d 1023, 1028 (Miss. 2001) (citing Miss. Code Ann. § 99-15-53 (Rev. 2000)); ***Moody***, 716 So. 2d at 594 (Miss. 1998); ***Martin v. State***, 635 So. 2d 1352, 1355-56 (Miss. 1994)).  "[A] trial court is not bound to accept a defendant's guilty plea or enforce a plea agreement reached between the prosecutor and defendant." ***Wade***, 802 So. 2d at 1028 (citing ***Moody***, 716 So. 2d at 594 (Miss. 1998)).  Based on a reading of the transcript, Wilson's stated reason for pleading guilty was that he did not believe he could receive a fair trial. This belief was based on Wilson's dissatisfaction with his appointed counsel.  The trial judge's stated reason for not accepting the plea was Wilson's dissatisfaction with his appointed counsel. Given that Wilson had no absolute right to have his plea accepted and given that the trial judge did not accept the plea due to Wilson's expressed dissatisfaction with appointed counsel, Wilson's argument that his plea was arbitrarily rejected is without merit.

¶16.  The alternative argument made by Wilson is that his lawyer's ineffective assistance prevented him from receiving the benefit of the plea agreement with the State, which would have resulted in a sentence of life imprisonment rather than death. The United States

9

Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), established the standard for assessing whether counsel was ineffective. For a claim of ineffective assistance of counsel, a defendant must establish: (1) counsel's performance fell below an objective standard of reasonableness, and (2) the defense was prejudiced as a result. *Strickland*, 466 U.S. at 687. In the case of a guilty plea, the second prong of prejudice is shown by proving that the ineffective assistance of counsel affected the outcome of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

¶17. Wilson argues that the trial judge's failure to accept the guilty plea on March 5, 2007, was directly related to the failure of his attorneys to communicate with him about his case, thus causing his expressed dissatisfaction with his trial counsel at the plea hearing. Wilson raises no issues as to his attorneys' performance related to the May 24, 2007, guilty pleas. Moreover, Wilson raises no issues as to the validity of the May 24, 2007, guilty pleas, which were accepted by the trial court. In support of his argument of ineffective assistance of counsel, Wilson references two letters sent to the trial judge wherein he expressed his dissatisfaction with his lawyers.

¶18. The first letter which Wilson wrote to Judge Gardner is undated, but was filed-stamped by the circuit clerk on March 5, 2007, the date of the first plea hearing. In this letter, Wilson begins by asking Judge Gardner to set a bond for him so that he can spend time with his family and take care of "family affairs" prior to his trial. Wilson then writes:

10

Judge Gardner I would also like to say that my attorney Will Bristow is neglecting to speak with myself about my case. I have also yet to meet with co-counsel Jim Johnstone regarding this case. I have requested that Will & Jim meet with me to discuss my defense in this matter and have yet to speak with either regarding this. Judge Gardner I have never spoken or went (sic) over details of any kind with my defense counsel. The only times I've met with Will was at arraignment, and 2 hearings and once at the jail before I was sent to Jackson and that was only to inform me that I was to go to Jackson on the 6th of January for an evaluation and no other times after my last hearing have I spoken with Mr. Bristow about my case. Judge Gardner I mention this because I am not prepared to go to trial on the 5th day of March and I feel that my communication with my attorneys needs to be more frequent considering the magnitude of this case. Judge Gardner I would like to thank you for your utmost time in these matters and I pray that you will be merciful in your decision upon these matters.

¶19. Wilson's second letter is dated May 15, 2007, nine days prior to the second plea hearing. Unlike the first letter, this second letter does not contain the file-stamp of the circuit clerk, and the letter appears in the record immediately after defense counsel's "Motion for Judgment of Acquittal JNOV as to Sentence or in the Alternative for a New Penalty Phase Trial," filed on June 7, 2007. We set out here, *in toto*, Wilson's letter:

Dear Judge Gardner,

I'm writing to you about my attorneys Mr. Bristow and Mr. Johnstone. As you know I am dissatisfied with their services and was in hopes that after my last court hearing they would be dismissed from my case, but to my knowledge they still represent my cause. Judge Gardner I've made repeated attempts to contact my attorneys but my resources here are quite limited. My attorneys can't or will not accept collect phone calls so I can (sic) communicate with them, so this leaves only 2 options, by letters or contact visits. Since neither attorney will come and speak with me at the jail I use letters for communication. *All attempts that I've made to communicate have proven to be futile so far.* Judge Gardner my attorneys are not acting in my best interest as I stated in my previous Court hearing. *My attorneys have failed to meet with me regarding my case.* The only information that has been disclosed to me is the State will seek death & we're still talking about a May 29th trial date

11

and that's it. This is the only conversation that has been since my last court hearing. I have still yet to meet with Mr. Johnstone regarding my case. My attorneys are not acting in my best interest and I request they be dismissed from my case. Judge Gardner, what I am meaning to say is my life as I know it depends on 2 attorneys with which neither will accept a collect phone call and neither will come and talk with me about my case. So how can I trust these attorneys with my life when they won't even do the simplest of things to inform me of court proceedings. Every time I've been to court I've been unprepared due to lack of communication with my attorneys. I've been in the blind so to speak. My attorneys are not acting in my best interest and I am requesting that they be dismissed from further court proceedings. Thank you Judge Gardner for your time and considerations in this matter.

(emphasis added).

¶20. Wilson also cites the transcript of his March 5, 2007, guilty plea colloquy wherein he expressed dissatisfaction with his counsel. Wilson likewise points to requests for compensation from his attorneys as evidence that they did not communicate with him.[6]

¶21. Mississippi Rule of Appellate Procedure 22(b), amended February 10, 2005, states:

Issues which may be raised in post-conviction proceedings may also be raised on direct appeal *if such issues are based on facts fully apparent from the record*. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.

(emphasis added). A comparison of the two letters with trial counsel's itemization attached to the motion for compensation, reveals inconsistencies regarding Wilson's claim about the lack of time his trial counsel spent with him and communicated with him. Simply stated, two

---

[6]Attached to court-appointed counsel's motion for compensation is an itemization setting out the services rendered, the dates on which the services were rendered, and the time spent in rendering those services. Wilson argues that this itemization reveals that his attorneys spent very little time in consultation with him about the case.

unsworn letters and an unsworn itemization of services attached to a motion for compensation hardly rise to the level of being "facts fully apparent from the record" to the extent that we may appropriately address this issue on direct appeal. We do not have competing affidavits from court-appointed trial counsel or other individuals who might shed any light on this issue. Likewise, it is not readily apparent from a review of the record whether Judge Gardner ever saw these letters from Wilson.

¶22. We previously have stated that, even though certain issues may be properly raised on direct appeal pursuant to Mississippi Rule of Appellate Procedure 22(b), in the end, this Court must determine whether a particular issue should be addressed and resolved on direct appeal, or whether such issue is better suited to be addressed via post-conviction-relief proceedings. *Havard v. State*, 928 So. 2d 771, 784 (Miss. 2006).

¶23. In sum, by raising this issue on direct appeal, Wilson has appropriately preserved his right to present evidence in support of this claim by way of subsequent post-conviction-relief proceedings without fear of a procedural bar. A review of the record in its entirety reveals that the factual basis of this claim has not been fully developed. It is clear that at the May 24, 2007, plea hearing, Wilson expressed his satisfaction with his counsel, the very same court-appointed attorneys who represented him on March 5, 2007. We thus find that this issue is better suited for future post-conviction-relief proceedings commenced pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act. *See* Miss. Code Ann. §§ 99-39-1 to 99-39-29 (Rev. 2007).

13

## II. WHETHER THE PROSECUTION COMMITTED MISCONDUCT BY IMPROPERLY CROSS-EXAMINING A MITIGATION WITNESS, THEREBY DEPRIVING WILSON OF A FUNDAMENTALLY FAIR SENTENCING.

¶24. The defense put on three mitigation witnesses: Jan Stembridge, Wilson's former teacher; Josh Estes, a friend; and Nancy McGee, Wilson's mother. The prosecutor questioned two of the mitigation witnesses about Wilson's drug use and Wilson's alleged assault of Augustina Conlee. What Wilson finds particularly "egregious" was the prosecution's cross-examination of Jan Stembridge, who was questioned by the prosecutor regarding her knowledge of Wilson's drinking habits and use of illegal drugs despite the fact that the prosecution did not put on evidence of Wilson's drinking or drug use. Thus, according to Wilson, there was no evidentiary basis for this line of questioning. Wilson also urged this Court in his brief to find that the State's addendum to its "Brief of Appellee" containing the mental evaluation conducted by Dr. Criss Lott should be barred procedurally from consideration as not having been duly designated as part of the record.

¶25. The State counters that Wilson is procedurally barred from raising this issue on appeal because he did not object to the line of questioning during the sentencing hearing or raise the issue in his motion for new trial or JNOV. The State further argues that this assignment of error raised by Wilson does not constitute plain error because no substantive rights were violated, considering that the questions posed by the prosecutor regarding drug and alcohol use were contained within the mental evaluation report that was ordered by the trial court and made available to the defense, the prosecution, and the trial judge. On the other hand, the

14

State does concede in its brief that, despite this evaluation having been ordered, the report cannot be found in the official record.[7]

¶26.    In the end, however, at oral arguments, both the State and Wilson, through appellate counsel, conceded that Dr. Lott's mental evaluation report was properly before this Court for consideration in analyzing this issue on appeal. Notwithstanding this concession, we deem it appropriate to discuss why this Court would still otherwise consider Dr. Lott's report in today's appeal.[8]

¶27.    The defense filed a motion requesting a mental evaluation, and it was so ordered by the trial court.  The contents of this report were referenced in a pretrial hearing in which the defendant was found to be competent. Moreover, the report was referenced by the trial judge during the guilty plea proceedings on May 24, 2007.  During that guilty plea hearing, the trial judge asked Wilson if he had read the report submitted by Dr. Criss Lott, to which Wilson responded that he had not.  The transcript reflects a pause in the proceedings for Wilson to review the mental evaluation report.  Afterward, the trial judge asked Wilson if he had any reason to question the validity of the report. Wilson responded, "No, sir." The State then moved to have the psychological evaluation marked as an exhibit and to be made part of the

---

[7]The mental evaluation report is found as Appendix A to the Brief of Appellee submitted by the State.

[8]At oral arguments, Wilson's counsel likewise conceded that there was no question that the information the prosecutor used to cross-examine Wilson's mitigation witnesses, especially Stembridge, at the sentencing hearing, came from Dr. Lott's mental evaluation report.

court file.[9] The trial judge answered in the affirmative. For reasons unknown to us, that report was not made a part of the record.

¶28. This Court was confronted with a similar factual situation in *Glasper v. State*, 914 So. 2d 708, 714-16 (Miss. 2005), where the defendant's pro se designation of the record included a transcript of a pretrial suppression hearing, which had not been designated officially as part of the record before this Court. The only procedural difference between *Glasper* and today's case is that, in *Glasper*, the State urged this Court not to consider a suppression hearing transcript which was not a part of the official record on appeal.[10] In today's case, Wilson urges this Court not to consider Dr. Criss Lott's sixteen-page evaluation report, which did not find its way into the official record, but which is attached to the appellee's brief. In *Glasper*, this Court found that a reading of the trial transcript revealed references to the suppression hearing transcript by the prosecutor during his cross-examination of the defendant at trial in an effort to impeach Glasper's trial testimony given during direct-examination. *Id.* at 715-16. This Court found that the substance of the questions asked by

---

[9]Wilson's Designation of Record on appeal included in part, designation of the following items for inclusion in the appeal record: "5. The entire transcript of the trial, with nothing omitted, including: . . . all exhibits marked for identification as admitted into evidence, all motions, all objections, all orders, ruling or opinions of the court, all other statements of the Court, attorneys, or others, and final arguments . . . 9. All transcripts of preliminary hearing[s] and all transcripts of all hearing[s] conducted on all Motions filed in this case; 10. All other Motions and Orders filed with the clerk which are not specifically designated herein; 11. All transcripts o[f] sentencing hearing[s] and all pleadings and orders filed in connection therewith."

[10]*Glasper*, 914 So. 2d at 714.

the district attorney during the trial, when compared to the substance of Glasper's prior testimony at the suppression hearing, revealed they were identical in content. *Id.* In other words, it was obvious that the prosecutor was using the pre-trial suppression hearing transcript to cross-examine the defendant at his trial before the jury based on his direct-examination testimony. In *Glasper*, we stated:

> When considering Glasper's pro se designation of the record, and when reading together the trial transcript and Glasper's addendum to the record, which consists primarily of the suppression hearing transcript, we deem it appropriate to consider this suppression hearing transcript in light of the fact that it was used extensively during the trial of this case, primarily in an effort by the State to impeach Glasper's in-court testimony before the jury. There is absolutely no question as to authenticity of this suppression hearing transcript.

*Id.* at 716.

¶29. Similarly, in today's case, the State's addendum to the record, Dr. Lott's sixteen-page psychological evaluation report, clearly is referenced during both the pretrial proceedings and the guilty plea proceedings. Moreover, the State asked that Dr. Lott's report be received into evidence, and the trial judge indicated that it would be marked and made part of the court file. A reading of the prosecutor's cross-examination of Stembridge during the sentencing hearing, in comparison to a reading of the mental evaluation report reveals that the prosecutor's questions came directly from Dr. Lott's report, in which Wilson had admitted to Dr. Lott his extensive alcohol and drug use. Thus, as in *Glasper*, the contents of the report may be considered by this Court in today's appeal.

¶30. Stembridge, a school teacher for twenty-eight years, testified that, approximately ten years prior to the 2007 sentencing hearing, she taught Wilson in the ninth and tenth grades.

17

Stembridge testified that Wilson was a good student; that he never gave school officials any trouble; and that Wilson's reputation among the teachers was that he was quiet and that he was not a "troublemaker." During his cross-examination of Stembridge, the prosecutor used Dr. Lott's report in an effort to impeach Stembridge on her lack of knowledge of Wilson's conduct away from the schoolhouse.[11]  During cross-examination, Stembridge in essence admitted that students generally behaved differently in front of their teachers than they did amongst their peers away from the school campus, and that teenagers likewise behaved differently on Sundays at church than they did away from church.  Then the following occurred during the prosecution's cross-examination of Stembridge:

> Q. – Saturday night versus Sunday thing.
> A. You hear a lot of Saturday night stories, though, when you're a school teacher and stuff.
> Q. Okay.  Well, let's talk about that for a minute.  For instance, did you know that Mr. Wilson – were you aware that he had started drinking at the age of 14?
> A. No.
> Q. You didn't know that?
> A. No.
> Q. Okay. And that he was drinking heavily by the age of 23.  Did you know that?
> A. No.
> Q. Okay. Did you know that he drank about a fifth every two days?
> A. No.

[11]We can safely deduce from the record that the issue was not whether Stembridge's testimony was truthful, but instead, whether Stembridge had sufficient knowledge of Wilson during this time frame as to his off-campus conduct. For example, as noted, *infra*, one of the questions propounded by the prosecutor to Stembridge was: "Okay. So, I mean, I'm not trying to get on to you for not knowing because, you know, like I said, he's not going to be lighting up in the classroom, but there are things obviously you don't know about him. Would that be fair to say?"

Q. Okay. Well and that was at one point when he was drinking heavily, I'm sorry.

Did you know that he began smoking marijuana around the age of 14?

A. No.

Q. Okay. So – and that's roughly the age he would have been, you know, 14 and on when you were teaching him, correct?

A. Right.

Q. Okay. So, I mean, I'm not trying to get on to you for not knowing because, you know, like I said, he's not going to be lighting up in the classroom, but there are things obviously you don't know about him. Would that be fair to say?

A. Yes.

Q. Okay. And you – did you have any way of knowing that by age 18 he was smoking a quarter to an ounce of marijuana daily?

A. No.

Q. You're not aware of that?

A. No.

Q. Okay. And were you aware that occasionally he would smoke up to a quarter pound of marijuana per week?

A. No.

Q. Okay. You weren't aware of that?

A. No.

Q. That the past two years prior to his arrest, which would have been I suppose 2003 and 2004, that he was smoking a half to a complete ounce a week.

A. No.

Q. Okay. Were you aware that he had used crystal methamphetamine from the age of 20 to the age of 22?

A. No.

Q. Okay. That he was using a gram every one to two days after that time, and that he was – his method of ingesting the substance was to smoke it.

A. No.

Q. Did you know that?

A. No.

Q. Did you know that he used cocaine from the ages of 20 to 22?

A. No.

Q. Okay. That he was using half an ounce of cocaine every two weeks.

A. No.

Q. You didn't know that. Okay.

Are you aware that he had taken LSD before?

A. No.

Q. Were you aware that he had taken Ecstacy before?

19

A. No.

Q. Were you aware that he had taken pills such as Lortab, Percocet, Xanax, Klonopin and Valium before?

A. No.

Q. Okay. Would it be fair to say that you don't know him as well as you think you did, if you don't know all that?

A. I guess.

Q. Okay.

¶31. There is no doubt that the prosecutor was using Dr. Lott's report to cross-examine Stembridge concerning Wilson's drug and alcohol use. On pages seven and eight of Dr. Lott's report we find the following information:

**DRUG AND ALCOHOL USE HISTORY:**

Mr. Wilson reported that he began drinking at the age of fourteen. He said that he was drinking heavily by the age of 23. He said that he was drinking a fifth every two days. He said that he drank this heavily for approximately six months. He said that he had stopped drinking and now only drinks approximately once a month, but denied any excessive alcohol use. He said that he began smoking marijuana around the age of fourteen. He said that by the age of 18 he was smoking a quarter to an ounce of marijuana daily. He said that he would occasionally smoke up to a quarter pound a week. He said that for the past two years prior to his arrest, he was smoking one half to one ounce a week. He said that the marijuana he had smoked had never been laced or dipped in any type of fluids.

He reported that he had used crystal methamphetamine from the age of 20 to 22. He said that he was using a gram every one to two days and he noted that he was smoking this substance. He said that he had also used cocaine during the ages of 20 to 22, and he was using a half an ounce of cocaine every two weeks. He said that he had tried LSD eight or nine times and had tried Ecstasy four or five times. He said that he had also used pain pills on a few occasions, including Lortab, Percocet, Xanax, Klonopin, and Valium.

He denied any history of intravenous drug use. He also reported no history of treatment for substance use. He said that his drug of choice had been marijuana.

20

¶32.    Wilson cites ***Lester v. State***, 692 So. 2d 755, 782 (Miss. 1997)[12], for the premise that a prosecutor may not ask questions on cross examination that do not have an evidentiary basis, as those questions may be highly prejudicial. Moreover, Wilson also cites ***Walker v. State***, 740 So. 2d 873, 884 (Miss. 1999), in support of this argument.  Both ***Lester*** and ***Walker*** are distinguishable from today's case.

¶33.    In ***Lester***, the defendant was found guilty by the jury of the murder of his one-year old daughter in the course of felonious child abuse. ***Lester***, 692 So. 2d at 765. During the sentencing phase of the trial, the prosecutor cross-examined the defendant's uncle about whether he had knowledge that the defendant had anally assaulted another child which he had fathered with a different woman. ***Id.*** at 781-82.  The cross-examination suggested that there was an eyewitness to the defendant's sexual assault of this child, but no such testimony on this alleged assault was elicited from the eye witness. ***Id.*** at 782.  This Court found reversible error in the trial court's failure to sustain defense counsel's objections to this line of questioning by the prosecutor. ***Id.***

¶34.    In ***Walker***, the defendant was found guilty by the jury of murder in the course of committing a robbery. ***Walker***, 740 So. 2d at 877.  Cooper Epps, a cellmate of the defendant while they were incarcerated in the local county jail, testified for the State in both the guilt phase and the sentencing phase of trial.  During the sentencing phase, defense counsel, via a motion in limine, sought to exclude Epps's testimony that the defendant had scribbled gang

---

[12]Overruled on other grounds by ***Weatherspoon v. State***, 732 So. 2d 158 (Miss.1999).

21

signs on the jail cell they shared. *Id.* at 883. During the guilt phase of his trial, the defendant had denied on direct examination that he had ever threatened to kill two of his accomplices who had testified during the trial. *Id.* On cross-examination during the guilt phase, the defendant had denied being involved in a gang and scribbling gang signs on the jail cell he shared with Epps. *Id.* at 883-84. The State offered no rebuttal testimony during the guilt phase relative to the defendant's alleged threats and gang activity. *Id.* at 884. During the sentencing phase, there was only hearsay testimony concerning the defendant's alleged threats and gang activity, and Epps testified that the defendant had scribbled gang signs on the jail cell wall; although Epps, on cross-examination, admitted that he was not familiar with gang signs. *Id.* at 885. Again, the State offered only hearsay testimony and no rebuttal as to the defendant's alleged involvement in a gang. *Id.* at 885-86. In the end, this Court found reversible error in allowing this evidence during the sentencing phase. *Id.* at 886.

¶35. We clearly distinguish both *Lester* and *Walker* from today's case, in that these two cases (in *Lester*, evidence of defendant's anal intercourse with a child; and in *Walker*, evidence of defendant's threats and gang activity) involved obvious efforts by the prosecution to put before the sentencing jury highly inflammatory evidence which had little if any relevance to the issues before the jury. Likewise, even assuming *arguendo* in *Lester* and *Walker* that the evidence had any relevance, there should be little doubt that the probative value of such evidence was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Miss. R. Evid. 403.

¶36. In his reply brief, in support of his position that the prosecutor improperly cross-examined Stembridge with the use of Dr. Lott's report, Wilson cites *Lanier v. State,* 533 So. 2d 473, 486-90 (Miss. 1988), for the premise that cross-examination based on the content of a report impermissibly injects hearsay into the proceedings. Indeed, at oral argument, Wilson's counsel emphasized that *Lanier* was the main case on which he relied in support of his position on this issue. However, a careful reading of *Lanier* shows that it is likewise distinguishable from today's case. In *Lanier*, the defendant was convicted of capital murder (killing a police officer who had responded to a domestic disturbance call at the house of his live-in companion). *Lanier*, 533 So. 2d at 476. After conviction, the sentencing phase of the trial commenced before the same jury which had found the defendant guilty of capital murder. *Id.* During the sentencing phase, the defendant attempted to prove the statutory mitigating circumstance that the killing of the police officer "was committed while he was under the influence of extreme mental or emotional disturbance." *Id.* at 486. *See* Miss. Code Ann. § 99-19-101(6)(b) (Rev. 2007). The defendant called several family members who testified before the jury that the defendant had engaged in bizarre behavior in the past, such as talking to telephone poles and going on destructive rampages. *Id.*

¶37. Additionally, the defendant called a jailer who testified that, during his incarceration at the local county jail, the defendant's behavior had demonstrated diminished capacity or mental incapacity. *Id.* On cross-examination, the prosecutor questioned the jailer, using a written report prepared by a clinical psychologist and a medical doctor at the Mississippi

23

State Hospital at Whitfield (MSH).[13] *Id.* The jailer admitted before the jury that he knew the defendant had been examined at MSH; that the defendant had a long history of drug and alcohol abuse; that the MSH report was sent to the local jail to aid the personnel during the defendant's incarceration; and that the MSH report indicated that the defendant was competent. *Id.* At this point, over the repeated objection of defense counsel, the following colloquy occurred before the jury:

> Q. You're familiar with [the MSH report] aren't you, Mr. Martin?
> A. Yes, sir.
> Q. And, you're familiar that it was the staff's unanimous opinion that he knew the difference between right and wrong at this time and at the time on December the 28th, 1985?
> . . . .
> A. Yes, sir.
> . . . .
> Q. And, you saw in that report, you also saw that they mentioned – the staff at Whitfield – no recommendation for further mental treatment –
> . . . .
> A. Yes, sir.

*Id.* at 487.

¶38.  With this backdrop in *Lanier*, this Court found that the prosecutor's cross-examination of the jailer using the MSH report was not for the purpose of impeachment, but instead was for the purpose of putting before the jury "a substantive conclusion" which was different from that which had been offered by the jailer on the issue of the defendant's mental

---

[13]Prior to trial, the defendant had requested a psychiatric examination, and the trial court granted the request, ordering the defendant to be examined by personnel at the Mississippi State Hospital at Whitfield, thus generating this report. *Lanier*, 533 So. 2d at 480.

capacity. *Id.* This evidence was offered by the prosecutor in an effort to undermine the defendant's efforts to prove the statutory mitigator that the killing had been committed while the defendant was under the influence of extreme mental or emotional disturbance. *Id.* at 486-87. This Court stated that "here the prosecution tried to suggest that others (more competent than the witness) disagreed with the witness' conclusion – for the purpose of disproving the witness' conclusion." *Id.* at 488. In the end, this Court found that the MSH report was impermissible hearsay because there was no evidence that the doctors who had prepared the report were unavailable to testify and the trial court did not follow the procedure provided in Mississippi Rule of Evidence 104(b) for the admissibility of evidence conditioned on the subsequent calling of the MSH doctors as witnesses to avoid violation of the Confrontation Clause of the Sixth Amendment of the United States Constitution. *Id.* at 488-89.

¶39. Returning to today's case, although the prosecutor unquestionably was using Dr. Lott's letter in his cross-examination of Stembridge, there is no indication in the record that Stembridge knew the source of the information which the prosecutor was using to cross-examine her concerning her obvious lack of knowledge as to Wilson's drug and alcohol use. There was no "battle of opinions" between Dr. Lott and Stembridge such that Dr. Lott would have to be called as a witness to avoid violation of the Confrontation Clause. Again, Stembridge merely had testified on direct examination that, as Wilson's ninth- and tenth-grade teacher, she knew Wilson as a good student who was well-behaved, and that Wilson's reputation among her fellow teachers was that Wilson was quiet and was not a troublemaker.

25

Armed with information contained in Dr. Lott's letter, the prosecutor conducted a garden-variety cross-examination of Stembridge to determine how well she really knew (or conversely, how well she did not know) Wilson. No credibility battle was created between Lott and Stembridge. For the reasons stated, we unhesitatingly find that there was no violation of the Sixth Amendment's Confrontation Clause.[14]

¶40. As to the prosecutor's conduct, this line of questioning by the prosecution was not improper or prejudicial, given that it was used to impeach Stembridge's testimony, which was proffered by defense counsel as mitigating evidence of good character. Where the defense has put the defendant's character at issue, this Court has stated:

> [T]hese prior bad acts were introduced when the defense opened the door to Hodges' character. Since § 99-19-101(1) allows any evidence that the court deems relevant to sentence and because these acts were relevant to rebut the direct testimony of Hodges' character, this assignment of error is without merit. This Court has also held that "the State is allowed to rebut mitigating evidence through cross-examination, introduction of rebuttal evidence or by argument." *Wiley v. State*, 750 So. 2d 1193, 1202 (Miss. 2000) (quoting *Turner v. State*, 732 So. 2d 937 at 950). As stated previously, these prior bad acts were admissible as proper rebuttal evidence. Therefore, this issue is without merit.

*Taggart v. State*, 957 So. 2d 981, 995 (Miss. 2007) (quoting *Hodges v. State*, 912 So. 2d 730, 756 (Miss. 2005)).

¶41. We also note that Mississippi Rule of Evidence 1101 states in pertinent part:

---

[14]The other two mitigation witnesses, Josh Estes and Nancy McGee, were subjected to only limited cross-examination by the prosecutor concerning the information contained in Dr. Lott's report. Therefore, we need not discuss this issue as it relates to them, as we have found that the prosecutor's extensive use of information from Dr. Lott's report to cross-examine Jan Stembridge was not error.

**(b) Rules Inapplicable.** Except for the rules pertaining to privileges, these rules do not apply in the following situations:

. . . .

(3) *Miscellaneous Proceedings.* Proceedings for extradition or rendition; probable cause hearings in criminal cases and youth court cases; **sentencing**; disposition hearings; granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.

(emphasis added).

¶42.    In **Randall v. State**, 806 So. 2d 185 (Miss. 2001), this Court succinctly stated that "Rules 101 and 1101(b)(3) state that the Rules of Evidence do not apply to sentencing hearings." **Id.** at 231-32.

¶43.    Finally, we acknowledge receipt of a Rule 28(j) letter from Wilson's counsel subsequent to the close of briefing and the oral arguments in this case. *See* M.R.A.P. 28(j).[15] The supplemental citation is to **Melendez-Diaz v. Massachusetts** (No. 07-591), ___ S.Ct. ___, 2009 WL 1789468 (U.S. Mass.), 77 USLW 4574, 09 Cal. Daily Op. Serv. 7994, 21 Fla. L. Weekly Fed. S 990 (Decided, June 25, 2009). In **Melendez-Diaz**, the United States Supreme Court held that the trial court's admitting certificates of analysis sworn by analysts

_____

[15]Mississippi Rule of Appellate Procedure 28(j) states:

 "When pertinent and significant authorities come to the attention of counsel after the party's brief has been filed, or after oral argument or decision, the party may promptly advise the clerk of the Supreme Court, by letter with a copy to all counsel, setting forth the citations. There shall be a reference either to the page of the brief or to a point argued orally to which the citations pertain, but the letter shall, without argument, state the reasons for the supplemental citations. Any response shall be made promptly and shall be similarly limited." Wilson's counsel has dutifully complied with this Rule.

at a state laboratory without requiring in-court testimony by analysts violated the defendant's Sixth Amendment right to confront the witnesses against him.[16] However, as already discussed, today's case does not involve a violation of the Confrontation Clause. We thus distinguish *Melendez-Diaz* from today's case.

¶44.. In sum, for the reasons stated, we find this issue to be without merit.

### III. WHETHER THE ADMISSION OF TESTIMONY BY DR. STEVEN T. HAYNE WAS IMPROPER AND A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL.

¶45. Wilson points to this Court's recent reversal in *Edmonds v. State,* 955 So. 2d 787 (Miss. 2007), in support of the argument that Dr. Hayne's "credibility as a witness and the reliability of his medical findings are at least objectively questionable in every case." Wilson maintains that the death sentence in this case rested heavily on Dr. Hayne's testimony. Wilson argues that defense counsel failed to obtain an expert witness to refute Hayne's testimony by not filing an affidavit of an expert along with the defense motion for funds to hire a pathologist. Wilson asserts that, as a result, the record is not fully developed as to this issue.

¶46. In the alternative, Wilson argues that the record reveals Dr. Hayne testified that his position was that of "Chief State Pathologist for the Department of Public Safety" for the State of Mississippi. Wilson correctly points to the fact that there is no such position in

---

[16]A prior decision of this Court is consistent with the holding in *Melendez-Diaz*. *See Barnette v. State*, 481 So. 2d 788, 790-92 (Miss. 1985) (prosecution prohibited from relying solely on sworn affidavits or certificates, in lieu of live testimony, to prove how drug analysis performed and results of drug analysis).

28

Mississippi. According to Wilson, this fact coupled with the criticism Dr. Hayne has received from this Court, should lend itself under heightened-scrutiny review to a finding by this Court that Wilson's due process rights were violated by Dr. Hayne's testimony.

¶47. The State argues that Wilson is procedurally barred from raising this issue because he did not object to the acceptance of Dr. Hayne as an expert in the area of forensic pathology, nor did Wilson raise the issue in his motion for new trial or JNOV. Alternatively, based on the merits of Wilson's argument, the State points to the fact that this Court in *Edmonds* reversed and remanded, not because Dr. Hayne was not qualified as an expert in the field of forensic pathology, but because Dr. Hayne testified outside his area of expertise. *Edmonds*, 955 So. 2d at 792. Furthermore, the State counters that Dr. Hayne has "unquestionably qualified to testify" as an expert in forensic pathology. *Duplantis v. State*, 708 So. 2d 1327, 1339 (Miss. 1998). The State cites *Byrom v. State*, 863 So. 2d 836, 863 (Miss. 2003), in support of its argument that Wilson must cite relevant authority in support of his argument and contends that Wilson has failed to do so; thus, the State maintains this argument should be dismissed.

¶48. We agree with the State that Wilson cites no authority, other than newspaper articles, to support his proposition that we should set aside Wilson's death sentence merely because Dr. Hayne testified in this case. Thus, this Court is not duty-bound to discuss this issue based on a procedural bar. However, procedural bar notwithstanding, we look briefly to this issue.

¶49. It is true that the reversal in *Edmonds* was not based on Dr. Hayne's lack of qualification as an expert witness. In *Edmonds*, this Court stated: "While Dr. Hayne is

29

qualified to proffer expert opinions in forensic pathology, a court should not give such an expert carte blanche to proffer any opinion he chooses." *Edmonds,* 955 So. 2d at 792 (Dr. Hayne offered "off-the-cuff" opinion that murder weapon may have been fired by two people having their finger(s) on the trigger at same time). Taken to its logical end, Wilson's argument would mean that this Court should adopt a per se rule that testimony by Dr. Hayne in any case renders the verdict in that case invalid. This argument is simply untenable. Any new evidence that could be developed for the purpose of impeaching Dr. Hayne's findings should be presented in later post-conviction-relief proceedings. *Havard v. State*, 928 So. 2d 771, 784 (Miss. 2006).

¶50.   Based on our discussion, we find this issue has no merit.

## IV.   WHETHER THE VICTIM IMPACT TESTIMONY WAS IMPROPER AND IN VIOLATION OF WILSON'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS.

¶51.   Wilson argues that when the prosecutor asked the victim's grandfather what he believed Wilson's punishment should be, this action violated his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and under Article 3, Sections 14, 25, and 28 of the Mississippi Constitution (1890). The State responds by pointing to Wilson's failure to object at the trial level, thus procedurally barring this issue from review. *See Moawad v. State*, 531 So. 2d 632, 635 (Miss. 1988). We agree that Wilson is procedurally barred from now raising this issue on appeal; however, procedural bar notwithstanding, we will proceed to address the merits of this issue.

30

¶52.    The testimony of Malorie's grandfather, Bennie Conlee, as it relates to this assignment of error, was as follows:

> Q.    And what do you feel is the appropriate punishment for the person who took that away?
> A.    I have no compassion for an individual. The individual who could do something like that was done to her displayed no compassion; in my opinion, acted with a depraved heart, and therefore they deserve no better.
> Q.    No better than what, sir?
> A.    The death penalty.
> Q.    That is what–
> A.    The same punishment she got for crying.

¶53.    As to the merits of the argument, the State argues that *Payne v. Tennessee*, 501 U.S. 808; 111 S. Ct. 2597; 115 L. Ed. 2d 720 (1991), endorsed the use of victim impact testimony and overruled the previous prohibition on victim impact testimony found in *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987).  Moreover, the State emphasizes that this Court and the Mississippi Legislature have recognized the need for victim impact testimony.  *See Hansen v. State*, 592 So. 2d 114, 145 (Miss. 1991); *see also* Miss. Code Ann. § 99-19-157(2)(a) (Rev. 2007).  Moreover, the State urges this Court to consider the Fifth Circuit's holding in *United States v. Bernard*, 299 F.2d 467, 480-81 (5th Cir. 2002), a case in which the Fifth Circuit found that victim impact testimony as to the appropriateness of imposing the death penalty was harmless error.

¶54.    While Wilson admits that *Payne* allowed for victim impact testimony regarding the familial impact of the victim's death and the characteristics of the victim, Wilson argues that *Payne* did not overrule the other portion of the *Booth* holding that found victim impact testimony regarding the witness's opinion of the crime or the defendant impermissible.  *See*

31

*Booth*, 482 U.S. at 508-09. According to Wilson, *Payne* left untouched the impermissibility of victim-impact-witness opinions as to the appropriate sentence. Wilson cites cases from various other state and federal jurisdictions[17] in support of this argument and urges this Court to adopt this rule and vacate Wilson's death sentence.

¶55. *Payne* held, "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609. This Court has not interpreted that holding to limit testimony to victim characteristics or the impact of the loss on the family. Victim impact testimony that includes the opinions of the victim's family members as to the crimes and the defendant is permissible. *Wells v. State*, 698 So. 2d 497, 512 (Miss. 1997).

¶56. In a factually similar case, *Havard v. State*, 928 So. 2d 771 (Miss. 2006), this Court rejected the exact argument raised by Wilson. In *Havard*, the victim's maternal grandmother testified as to what she believed to be the appropriate punishment. *Id*. at 791-92. The

---

[17]*See Lynn v. Reinstein*, 68 P.3d 412 (Ariz. 2003) ("[T]he Eighth Amendment to the United States Constitution prohibits a victim from making a sentencing recommendation to the jury in a capital case."); *Wimberly v. State*, 759 So. 2d 568, 572 (Ala. Crim. App. 1999) ("*Payne* did not overrule that portion of *Booth* that proscribed consideration of the victim's family members' characterizations or opinions about the defendant, the crime, or their beliefs as to an appropriate punishment."); *State v. Hoffman*, 851 P.2d 934, 941 (Idaho 1993); *State v. Bernard*, 608 So. 2d 966, 970 (La. 1992); *Farina v. State*, 680 So. 2d 392, 399 (Fla. 1996); *Kaczmarck v. State*, 91 P.3d 16, 37 (Nev. 2004); *People v. Towns*, 675 N.E. 2d 614 (Ill. 1996); *Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999); *Woods v. Johnson*, 75 F.3d 1017, 1038 (5th Cir. 1996).

32

grandmother testified, "Justice means [a] life was taken, and there is only one way that we can find justice for [the victim's daughter]. A life for a life." *Id.* at 792. This Court found this to be within "the boundaries of permissible victim impact testimony." *Id.* We found this testimony to go straight to the impact that losing her granddaughter had on everyone in the family, not an attempt to incite the jury. *Id*. We likewise stated that, assuming *arguendo* that the testimony constituted error, under the reasoning of the Fifth Circuit in *Bernard,* requests by a family member for the jury to sentence a defendant to death can constitute harmless error when any resulting prejudice was mitigated by the trial judge instructing the jurors not to be swayed by passion, prejudice, or sympathy. *Id.* (citing *Bernard*, 299 F.2d at 480-81).

¶57. In the case now before the Court, Bennie Conlee's testimony was of the same nature as that in *Havard*. It is highly unlikely that Conlee's statement, when read as a whole and taken in context with all the evidence before the sentencing judge, was the reason the judge imposed the death penalty. In fact, the trial judge's sentencing order, in which he makes findings of facts as to the various aggravating and mitigating factors, does not even mention Conlee's testimony. This assignment of error, therefore, is meritless.

## V. WHETHER CUMULATIVE ERROR REQUIRES REVERSAL OF THE CONVICTION AND SENTENCE IN THIS MATTER.

¶58. Wilson argues that if this Court finds no reversible error was committed, then the Court should find that Wilson's assignments of error reveal, at the very minimum, harmless error. Moreover, Wilson argues that the number of harmless errors committed by the trial court should have a sufficient cumulative effect to result in prejudice to his defense. The

33

cumulative error doctrine holds that while harmless error in and of itself is not reversible, where more than one harmless error occurs at the trial level, those errors may have the cumulative effect of depriving a defendant of a fair trial. In *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003), we stated:

> [U]pon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.

*Id.* at 847. *Bennett v. State*, 990 So. 2d 155, 161 (Miss. 2008); *Ross v. State*, 954 So. 2d 968, 1018 (Miss. 2007).

¶59. Since all the assignments of error have been found to be without merit, there is no error, harmless or otherwise. Without harmless error, there can be no cumulative error. Alternatively, even if harmless error were to be found, this Court has stated:

> [E]rrors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive [the defendant] of a fundamentally fair and impartial trial.

*Byrom*, 863 So. 2d at 847.

¶60. Accordingly this issue is without merit.

## VI. SECTION 99-19-105(3) REVIEW

¶61. Having addressed all issues raised on this appeal by Wilson, we now proceed to perform our statutorily-mandated duty to review the proportionality of Wilson's death sentence pursuant to Mississippi Code Section 99-19-105(3), which states:

34

(3) With regard to the sentence, the court shall determine:
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
> (b) Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error or both.

Miss. Code Ann. § 99-19-105(3) (Rev. 2007).

¶62. In conducting our review of the record in today's case, we find nothing in the record which would support a finding that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. In his Findings of Fact and Sentencing Order, the trial judge made the following findings concerning the existing statutory aggravating circumstances:

> A. The Court finds beyond a reasonable doubt that the capital offense (killing Malorie Conlee) was committed while the Defendant was engaged in the commission of the crime of felony child abuse in violation of subsection (2)(f) of § 97-5-39, Mississippi Code of 1972, Annotated, as amended; and
> B. The Court finds beyond a reasonable doubt that the capital offense was especially heinous, atrocious and cruel in that the victim, Malorie Conlee, a child 2 years of age and weighing something less tha[n] 20 pounds, was struck by the Defendant three times on her head resulting in both internal and external injuries which resulted in her death approximately eight hours later. During the period from the time of those blows, the victim suffered pain so long as she remained conscious. During this same period Defendant and the child's mother failed to obtain medical care for her in order to alleviate the pain and possibly save her life because of fears associated with bruises on the face and

35

body of the child and suspicions that might be aroused when they were seen by health care providers.

The Court further finds beyond a reasonable doubt that the killing of Malorie Conlee was especially atrocious in that she was extremely vulnerable because of her tender age and small size; that she did not have means to defend herself from the Defendant's blows or to avoid his attack.

These findings by the trial judge are supported by the record, which includes, *inter alia*, the transcript of the guilty plea hearings in which offers of proof were made and Wilson admitted his actions; the testimony of Dr. Hayne; and the post-death photographs of the victim, Malorie Conlee.

¶63. Upon comparison to other factually similar cases where the death sentence was imposed, the sentence of death is not disproportionate in this case. Given the equally heinous nature of the crime committed here, we conclude that imposition of the death penalty on William Matthew Wilson is neither excessive nor disproportionate in comparison to his crime.

## CONCLUSION

¶64. For the reasons stated, we affirm the Lee County Circuit Court's judgment that William Matthew Wilson suffer the penalty of death for the capital murder of Malorie Conlee.

¶65. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II: CONVICTION OF FELONIOUS CHILD ABUSE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES SHALL RUN CONSECUTIVELY.**

36

**WALLER, C.J., DICKINSON, RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHEN, J., DISSENTS WITH SEPARATE WRITTEN JOINED BY GRAVES, P.J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶66. "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. Because it is apparent from the record that Wilson was denied counsel during a critical stage of the proceedings, in violation of the Sixth Amendment, I must respectfully dissent.

¶67. According to his own documentation, Lawyer Will Bristow met with his client a total of thirty minutes on the day of Wilson's arraignment, September 7, 2005. Eighteen months later, on March 5, 2007, Bristow purported to represent Wilson as he pled guilty to capital murder and felonious child abuse. According to Bristow's own time records, during this eighteen-month time period, he never again consulted with his client. His co-counsel, James Johnstone, had never even met Wilson before the March 5, 2007, plea hearing. These facts are undisputed, and are supported by Wilson's letters to the trial court.

¶68. Wilson asserts that the extremely inadequate communication with his counsel rendered them ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to succeed on a *Strickland* claim, Wilson must demonstrate both deficient performance by his counsel and resulting prejudice. *Id.*, 466 U.S. at 687. However, in some circumstances, prejudice can be presumed. *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). For example, the trial

37

process is presumptively unfair "if the accused is denied counsel at a critical stage of his trial." *Id.*, 466 U.S. at 659. Such denial of counsel may be actual or constructive. *Perry v. Leeke*, 488 U.S. 272, 280, 109 S. Ct. 594, 102 L. Ed. 2d 624 (1989) (quoting *Strickland*, 466 U.S. at 692). Furthermore, "critical stage[s]" are not limited to formal hearings in a courtroom, and the United States Supreme Court has recognized the pretrial stage as "perhaps the most critical period." *Powell v. Alabama*, 287 U.S. 45, 57, 53 S. Ct. 55, 77 L. Ed. 158 (1932).

¶69. Thus, when an attorney fails to consult with his client during the entire pretrial period, the defendant is constructively denied counsel during a critical stage of the proceedings and prejudice may be presumed. *Mitchell v. Mason*, 325 F. 3d 732 (6th Cir. 2003). In a strikingly similar case, the Sixth Circuit Court of Appeals found a presumption of prejudice where trial counsel met with the defendant for no more than six minutes in the seven-month period before trial. *Id.* These few minutes of consultation with the defendant comprised the totality of three separate meetings in a jail bullpen, just prior to pretrial hearings. *Id.* at 741. Counsel had been suspended from the practice of law for the month immediately preceding trial; but it was the lack of consultation with his client in the six-month period prior to his suspension that merited a finding that the defendant had been denied counsel. *Id.* at 742.

¶70. After a thorough examination of United States Supreme Court precedent, the *Mitchell* court held that "[t]he pre-trial period constitutes a 'critical period' because it encompasses counsel's constitutionally imposed duty to investigate the case," and "without pre-trial consultation with the defendant, trial counsel cannot fulfill his or her duty to investigate."

38

*Id.* at 743. Relying heavily on language from ***Strickland*** regarding counsel's duty to investigate, the court determined:

> Because the Supreme Court has repeatedly made clear that there is a duty incumbent on trial counsel to conduct pre-trial investigation, it necessarily follows that trial counsel cannot discharge this duty if he or she fails to consult with his or her client.
>
> . . . .
>
> The Sixth Amendment guarantees more than a pro forma encounter between the accused and his counsel, and six minutes of consultations spread over three meetings do not satisfy its requirements. "Assistance begins with the appointment of counsel, it does not end there." ***Cronic***, 466 U.S. at 654 n.11.

*Id.* at 744.

¶71. Not unlike ***Mitchell***, Wilson's pretrial contact with counsel was limited to brief meetings just prior to court hearings. Although Bristow documented that he had met with Wilson at arraignment for thirty minutes, there is no evidence to contradict Wilson's claims that he had very limited or no contact with his attorneys during the eighteen-month period between arraignment and his first attempt to plead guilty. That the proceeding was a plea colloquy and not a full-blown jury trial did not lessen counsels' duty to consult with their client.

¶72. Despite the undisputed evidence before us, the majority declines to address the issue, finding that the facts are not fully developed. The opinion cites "inconsistencies" in Wilson's claim, but fails to elaborate about what the inconsistencies might be. The opinion also suggests that "competing affidavits" would be necessary to assess the argument, maintaining that "two unsworn letters and an unsworn itemization of services" are not

39

enough.[18] Yet, Wilson's contemporaneous letters to the circuit judge and the lawyers' time records corroborate each other and are not disputed by the State. All made their way into the court file, and were thus before the presiding circuit judge and should, at a minimum, have generated concern on his part with respect to whether Wilson was being adequately represented by the lawyers he had appointed. Such judicial concern should have led to an on-the-record inquiry by the trial court, and thence to whatever remedial measures, if any, were found to be warranted.

¶73. In sum, Wilson was denied the benefit of counsel throughout the pretrial period. From the record before us, I would reverse and remand for trial. However, at the very least, the record presents a prima facie case of denial of counsel, and Wilson should be allowed to present his claims at an evidentiary hearing.

**GRAVES, P.J., JOINS THIS OPINION.**

---

[18]There are, in fact, two itemizations of time: one from Bristow and one from Johnstone. As noted above, Bristow's itemization indicates a half-hour consultation with his client on the day of arraignment. Johnstone's itemization indicates that he did not meet with his client until the first plea hearing.

40

**APPENDIX**

**<u>DEATH CASES AFFIRMED BY THIS COURT</u>**


*Goff v. State,* ____ So. 3d ____, 2009 WL 1477246 (Miss., May 28, 2009).

*Chamberlin v. State***,** 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## <u>AND SENTENCE PHASE</u>

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.