# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-KA-01005-SCT

*THOMAS IRBY*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 05/13/2009 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | CLARKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/09/2010 |
| MOTION FOR REHEARING FILED: | 10/08/2010 |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., RANDOLPH AND KITCHENS, JJ.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is denied. The original opinion is withdrawn, and this opinion is substituted therefor.

¶2. A Clarke County jury found Thomas Irby guilty of DUI maiming. The Clarke County Circuit Court, Judge Robert W. Bailey presiding, sentenced Irby to serve a sentence of twenty-five years in the custody of the Mississippi Department of Corrections as a habitual offender. Aggrieved, Irby appeals. Finding no error, we affirm.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶3. On the afternoon of May 10, 2008, while driving a Ford Ranger pick-up truck, Thomas Irby collided with a Dodge van driven by Olivia Miller. Also occupying Olivia's vehicle was her husband, Justin Miller. All three were injured. Both drivers sustained injuries to their legs and feet, and the passenger, Justin, sustained brain injuries and was in a coma for four weeks after the accident. At the time of trial, Justin had use of only his left arm and hand. He was unable to speak clearly. He had received care at various hospitals, including a facility specializing in brain injury in Atlanta, Georgia. At the time of trial, the Millers had incurred $2,000,000 in medical bills. Justin's prognosis at the time of trial was uncertain, and doctors were unable to predict whether he would ever walk again. Irby's charge of DUI maiming stemmed solely from the injuries sustained by Justin.

¶4. According to Olivia Miller's testimony, on the day of the accident, she was traveling north on County Road 430 in Clarke County. Upon passing over a hill, she discovered a pick-up truck in her lane about a tenth of a mile in front of her, traveling south in the northbound lane. Olivia testified that to her right was a ditch, and that because of the ditch, she did not feel she could safely veer off the road to her right. Accordingly, she veered sharply into the left lane. As soon as she went left, Irby veered to his right into the proper lane. As a result, the two automobiles collided, not quite head-on, but at a slight angle. Olivia Miller further testified that just after the accident, while in close proximity with Irby, she had detected the smell of alcohol.

¶5. Clarke County Deputy Sheriff Jerry Ivey responded to the scene of the accident. After impact, both vehicles were observed to have come to a stop on the west side of the highway. Ivey diagrammed the final resting place of each vehicle and testified that, while at the scene, he had observed tire marks from the pick-up in the northbound lane headed south and tire marks from the van in the northbound lane headed north. He testified that he had smelled alcohol in the pick-up truck and had observed a beer can lying inside the truck on the driver's side floorboard.

¶6. Ivey followed the ambulance transporting Irby to a local hospital and spoke with Irby at the hospital. Ivey testified that he had asked for and received consent from Irby for a blood sample. Ivey further testified that he had read to Irby the contents of the law-enforcement form requesting that the hospital withdraw a blood sample. Ivey testified that he had informed Irby of his right to refuse consent to draw the blood sample. Ivey testified that the nurse had read Irby a second form, the Consent by Individual form (hereinafter "consent form"), which both Irby and the nurse had signed. The consent form read, in pertinent part, as follows: "I, Thomas Irby, consent to the taking of a blood or urine specimen from me for an investigation by a duly authorized law enforcement official . . . ." Moreover, the form explicitly stated that "results of the test may be made available to law enforcement." According to the deputy, Irby had appeared "alert and awake." The consent form bears Irby's signature. After Nurse Lauren Westbrook drew Irby's blood, Ivey sent the samples to the Mississippi Crime Laboratory in Meridian.

3

¶7.     John Stevenson, a forensic scientist with the Mississippi Crime Laboratory, testified regarding the results of the blood-alcohol and drug analysis.  Irby's blood tested positive for benzodiazepines, benzoylecgonine (a breakdown product of cocaine), and opiates. The particular benzodiazepine found in Irby's blood sample was alprazolam, commonly known as Xanax. The opiate was hydrocodone, which is commonly prescribed as a pain-killer. As to the breakdown product of cocaine, or metabolite of cocaine, Stevenson explained that cocaine "is in your system very readily.  It is maybe 30 minutes at the most. It's very rapidly gone once you use. The metabolites are what are found . . . not the parent compound." Stevenson testified that a positive result for a metabolite of cocaine means that a person has ingested cocaine; however, Stevenson had been unable to determine when Irby had ingested cocaine relative to the accident. Irby's blood sample was then sent to National Medical Services Laboratories (NMS Labs) in Pennsylvania for quantitative analysis.

¶8.     Dr. Laura Labay, a forensic toxicologist with NMS Labs, testified as to the quantitative analysis of Irby's blood sample.  Irby's blood sample contained 410 nanograms per milliliter of the cocaine metabolite benzoylecgonine, 90 nanograms per milliliter of hydrocodone, and 87 nanograms per milliliter of alprazolam. Dr. Labay testified that the benzoylecgozine in and of itself would have had no pharmacological activity or effect. Dr. Labay testified that the therapeutic range for alprazolam is 10 to 50 nanograms per milliliter and that a concentration of 75 nanograms per milliliter or more is potentially toxic. Side effects of alprazolam include fatigue and drowsiness. Likewise, hydrocodone, a

4

semisynthetic narcotic analgesic, produces the side effect of drowsiness. As to the effects of these drugs on Irby's ability to operate a motor vehicle, Dr. Labay testified from her report:

> Based on the concentration of Alprazolam and Hydrocodone found in this case, it can be stated with reasonable scientific certainty that if the individual showed signs of impairment . . . then these substances can be responsible for the production of that impairment, especially in the absence of a more competent cause. Such impairment would be characterized by diminished faculties associated with the safe operation of a motor vehicle, including impaired alertness, judgement [sic] perception, coordination, response time and sense of care and caution. These decrements can cause the individual to be impaired to and beyond the point of rendering this individual unfit to operate a motor vehicle safely.

¶9.    Two additional witnesses for the State testified that they had seen Irby earlier in the day on May 10, 2008. Both testified that Irby had run his pick-up truck off Causeyville Road and had gotten stuck in a ditch. One of the passersby, Gene Jay, stopped to see if Irby was injured, but then declined Irby's request for assistance in pulling his truck out of the ditch because Jay was of the opinion that Irby's behavior appeared erratic and that Irby should not have been driving.

## DISCUSSION

¶10.    Irby raises three points of error for this Court's review: (1) Was blood evidence improperly admitted, (2) were the defendant's confrontation rights protected, and (3) was the verdict supported by the evidence?[1]

---

[1] On motion for rehearing, Irby argues, for the first time, that his indictment is insufficient because it did not allege that the substances in his bloodstream "impaired [his] ability to operate a motor vehicle." Miss. Code Ann. § 63-11-30(1) (Rev. 2004). A party may not raise a new issue on motion for rehearing. *McFarland v. Entergy Miss., Inc.*, 919 So. 2d 894, 904 (Miss. 2005) (citing *Brewer v. State*, 819 So. 2d 1169, 1175 (Miss. 2002)).

¶11. Irby was charged pursuant to Mississippi Code Section 63-11-30(5) (Rev. 2004), in connection with the permanent injuries sustained by Justin Miller in the collision. The necessary elements of a conviction pursuant to Section 63-11-30(5) are: (1) that the defendant negligently caused the death, disfigurement, or permanent disability or destruction of "the tongue, eye, lip, nose or any other limb, organ or member of another" (2) while operating a motor vehicle under the influence of alcohol or a controlled substance which has impaired such person's ability to operate a motor vehicle. Miss. Code Ann. § 63-11-30(1)(b), (5) (Rev. 2004).

## I. WHETHER THE BLOOD EVIDENCE WAS IMPROPERLY ADMITTED.

¶12. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search." Miss. Const. art. 3 § 23. "The degree of intrusion necessary in the taking of a blood sample is sufficient to require the presence of probable cause." *McDuff v. State*, 763 So. 2d 850, 854 (Miss. 2000) (quoting *Schmerber v. Cal.*, 384 U.S. 757, 770-71, 86 S. Ct. 1826, 1835-36, 16 L. Ed. 2d 908, 919-20 (1966)).

¶13. Voluntary consent to a search eliminates an officer's need to obtain a search warrant. *Graves v. State*, 708 So. 2d 858, 863 (Miss. 1997) (citing *Davis v. United States*, 328 U.S. 582, 66 S. Ct. 1256, 90 L. Ed. 1453 (1946); *Jones v. Miss. Dep't of Pub. Safety*, 607 So. 2d

---

Thus, this issue is procedurally barred.

6

23, 26 (Miss. 1991); *Waldrop v. State*, 544 So. 2d 834, 837 (Miss. 1989); *Whittington v. State*, 523 So. 2d 966, 973 (Miss. 1988); *Hudson v. State*, 475 So. 2d 156, 159 (Miss. 1985)). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Jones*, 607 So. 2d at 26)).

¶14. In addition to voluntary consent, a knowledgeable waiver of this right to be free from unreasonable search also is required. *Penick v. State*, 440 So. 2d 547, 549 (Miss. 1983). Irby cites the rule in *Penick*, which states that, for a consent to search to be valid, "it must clearly appear" that the subject "voluntarily permitted, or expressly invited and agreed to the search, *being cognizant of [his] rights in the premises* when the officer proposed to [him], by asking [his] permission, to make the search without a warrant." *Id.* (citing *Smith v. State*, 133 Miss. 730, 736, 98 So. 344, 345 (1923)) (emphasis added).

¶15. In *Graves v. State*, 708 So. 2d 858, 864 (Miss. 1997), this Court held:

> If the defendant claims that his waiver was not knowledgeable, the burden is on him to raise the issue of lack of knowledgeable waiver. Knowledgeable waiver is defined as consent where the defendant knows that he or she has a right to refuse, being cognizant of his or her rights in the premises.

*Graves,* 708 So. 2d at 864 (citing *Jones*, 607 So. 2d at 28).

¶16. "[A] trial judge enjoys a considerable amount of discretion as to the relevancy and admissibility of evidence. Unless this judicial discretion is so abused as to be prejudicial to the accused, we will not reverse his ruling." *Graves v. State,* 492 So. 2d 562, 565 (Miss.

7

1986) (citing *Page v. State*, 295 So. 2d 279 (Miss. 1974); *Shearer v. State*, 423 So. 2d 824, 826 (Miss. 1983)).

¶17. Irby's argument as to this issue is two-fold: (1) the trial court erred in admitting the blood analysis because the nurse who drew the blood did not testify to the voluntariness of Irby's consent; and (2) because Irby was being prepared for surgery, he was incapacitated and unable to consent knowingly to providing a blood sample.[2] Accordingly, Irby maintains that testimony regarding "other substances" in Irby's blood sample should not have been admitted.

¶18. During Stevenson's testimony, Irby objected to the admission of the blood-analysis results, stating that "we've objected to the method [sic] the blood was taken, so we certainly have to object to the way these reports are now being presented to the Court for entry into evidence." The results were admitted over Irby's objection. Irby also objected to Ivey's testimony that he had observed Westwood read the contents of the written consent form and had observed both Irby and Westwood sign the form. The objection to the officer's testimony regarding written consent made at trial was that Westbrook's testimony was necessary to establish a "chain of custody." An objection based on failure to establish a chain of custody

---

[2]To be clear, Irby's blood sample was not withdrawn subject to an arrest, nor was he in custody at the time it was withdrawn. The law enforcement officer who had been at the scene had Irby's blood withdrawn based on Irby's oral and written consent. "*Schmerber v. California*, [384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966)], should put to rest any contention that taking a blood sample as a lawful incident to an arrest for driving while intoxicated violates either the Fourth, Fifth or Sixth Amendments to the U.S. Constitution." *Penick v. State,* 440 So. 2d 547, 551 (Miss. 1983).

is not an objection based on a failure to establish the voluntariness of consent. Mississippi Rule of Evidence 103(a)(1) reads, in pertinent part, as follows:

> (a) **Effect of Erroneous Ruling**. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

> (1) *Objection*. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection . . . .

The objection made at trial did not state with requisite specificity the basis for the objection to the admission of the testimony. An objection based on the fact that the officer could not testify to what he personally observed was properly overruled by the trial court. Ivey could testify to what he personally observed concerning Irby's written consent to the blood test. *See* Miss. R. Evid. 602.

¶19.    Irby cites *Comby v. State*, 901 So. 2d 1282, 1285-86 (Miss. Ct. App. 2004), in support of his argument that it was necessary for Westbrook to testify.  In *Comby*, the Court of Appeals noted the following regarding the facts of the case:

> Comby signed a consent form to have his blood drawn and tested for law enforcement purposes. To determine whether Comby's consent was valid, the trial court, outside the presence of the jury, heard testimony from the nurses who were present when Comby signed the consent form, the deputy who obtained Comby's consent, and Comby himself.

*Id.* at 1285.  In *Comby*, the appellate court upheld the trial court's ruling that the defendant's consent was voluntary. *Id*. at 1285-86. Irby also cites the following dicta from *Cutchens v. State,* 310 So. 2d 273, 280 (Miss. 1975):

9

It would have been better practice to have examined into the voluntariness of the consent outside of the presence of the jury but since the evidence was sufficient to sustain the fact that Cutchens' consent was voluntarily given no prejudicial error was committed. If the evidence had shown lack of voluntary consent, a reversible error would have resulted requiring reversal and remand.

*Id.* at 280.

¶20. While Irby objected to the testimony of Stevenson and Ivey, Irby never properly raised the validity-of-consent issue. Accordingly, the trial court never ruled on the voluntariness of Irby's consent. The suppression of the blood sample was first raised in a motion in limine to exclude the analysis on the basis that the officer had obtained a blood sample under Mississippi Code Section 63-11-7 (Rev. 2004), a statute which allows for obtaining a blood sample for the purposes of a blood-alcohol analysis from a person "unconscious at the time of arrest or apprehension or when the test is to be administered, or is otherwise in a condition rendering him incapable of refusal . . ." and "under the influence of intoxicating liquor." Miss. Code Ann. § 63-11-7 (Rev. 2004). According to Irby's motion in limine, the analysis for other substances should have been suppressed because the statute at issue allows only for blood-alcohol analysis, not for the presence of other intoxicating substances. The State, however, never compelled the blood sample under Section 63-11-7, but always maintained that Irby had consented to the blood test.[3]

---

[3]Defense counsel at trial stated that it was unaware at the time the motion in limine was filed that Irby had given consent; thus, defense counsel erroneously believed the blood sample to have been taken pursuant to Section 63-11-7. The record reflects that, upon learning of this consent, the defense abandoned its argument concerning Section 63-11-7, and that was why the motion in limine was never taken up by the trial court.

¶21. Additional objections to Ivey's testimony regarding the validity of Irby's consent were not made by the defense until Ivey was later recalled to the stand after testimony by both blood analysts already had been admitted. Accordingly, Irby did not timely object to the admission of the blood-analysis evidence. For all the reasons stated above, we find that the blood-analysis evidence was properly admitted. Thus, this issue has no merit.[4]

## II. WHETHER IRBY'S SIXTH-AMENDMENT CONFRONTATION RIGHTS WERE PROTECTED.

¶22. Irby argues that his right to cross-examine Ivey was limited by the trial judge, in violation of his right to confrontation under the Sixth Amendment. In his brief, Irby states that the trial court sustained an objection to the defense's line of questioning regarding the validity of Irby's consent. This statement from Irby's brief does not accurately reflect the actual ruling by the trial court.

¶23. Ivey testified as to the accident scene and Irby's oral and written consent to the blood test. As previously discussed, the defense objected to this testimony on the basis that Westbrook had not been called to testify; thus, Ivey should not have been allowed to testify as to written consent. This objection was heard and argued outside the presence of the jury. The trial court overruled the defense's objection, because Ivey had witnessed the defendant and the nurse sign the consent form and thus had personal knowledge of consent. The officer

---

[4] Irby also argues that he suffered from diminished capacity and could not validly consent to giving a blood sample. Because the record is insufficient on this issue, we find that this contention is better suited for a motion for post-conviction relief. *Wilson v. State*, 21 So. 3d 572, 580 (Miss. 2009).

went on to testify that, after the blood sample was obtained, the vials of blood were sent to the Mississippi Crime Laboratory. When asked if the defense wished to cross-examine Ivey at that time, the defense declined to do so. Following Ivey's testimony, the State introduced testimony, absent objection, from the defense, as to the other substances found in Irby's blood-sample analyses.

¶24. Ivey later was recalled by the State. After a brief direct examination, Ivey was cross-examined regarding the diagram of the accident and observations of the victims after the crash. Then, defense counsel questioned Ivey regarding his actions upon arriving at the hospital. The defense began a line of questioning as to whether Ivey would have obtained the blood sample even if Irby had refused to give consent. As defense counsel began to recite for Ivey the statute pertaining to withdrawing blood for the purpose of obtaining a blood-alcohol analysis, the State objected on the basis of relevance. The Court sustained the State's objection on the basis that the State had chosen to travel under the presumption that Irby had given valid consent to the blood sample. Defense counsel then asked whether the victims were unconscious, to which the State objected on the same basis that this question pertained to the statute, not to consent. The Court then dismissed the jury.

¶25. Outside the presence of the jury, the State argued that the fact that Irby had given oral and written consent already had been admitted into evidence in Ivey's previous testimony. Moreover, the blood analysis from the Mississippi Crime Lab and Dr. Labay already had been admitted into evidence. Thus, according to the State, validity of consent had been

12

waived, and whether the officer had obtained the blood sample pursuant to Section 63-11-7 was irrelevant. The defense argued:

> We are attacking the consent. It was asked in direct and we have an opportunity to cross-examine him on that. Now, whether or not this officer had an alternate way to get exactly what he had already sought out to get, i.e., blood, in this situation is motive. That's why we're questioning it. We think it's motive on whether or not he did or did not have Mr. Irby sign this form under his own consent or his own permission. It goes to . . . [the officer's] intent . . . .

The trial court ruled that defense counsel could proceed with this line of questioning only outside the presence of the jury. In doing so, the trial judge stated that the motion in limine, which sought to suppress the blood sample because it was compelled by Section 63-11-7, was filed but never argued; thus, it had been waived. Moreover, the trial court found irrelevant "whether there's an alternate method" for compelling a blood sample, which the State had never pursued, since Irby had given his consent.

¶26. Only after the trial judge dismissed the jury did defense counsel move on from the line of questioning on whether Ivey thought he could compel a blood sample from Irby pursuant to Section 63-11-7 to a line of questioning as to whether Ivey considered the defendant to be alert and able to give consent. Ivey testified that Irby was conscious and capable of giving consent as well as informed of his right to withhold consent. We find no error on the part of the trial judge, as the trial judge properly ruled that Ivey's "motive" or "intent" for obtaining consent from Irby was irrelevant, and evidence of it should not be presented to the jury. Additionally, as previously discussed, Irby never properly moved the trial court to make an on-the-record finding outside the presence of the jury, nor did Irby ever proffer any evidence

13

that Irby was suffering from diminished capacity to consent to the blood test. Accordingly, this argument is without merit.

### III. WHETHER THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE VERDICT AND WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶27. Irby contends that the verdict was against the overwhelming weight of the evidence and that the evidence was insufficient to support the verdict. Irby filed his motion for a new trial and/or judgment notwithstanding the verdict on May 14, 2009. It was denied by order of the trial court entered May 19, 2009.

> On review of a challenge to the weight of the evidence, this Court will reverse for a new trial only if the trial court's ruling was an abuse of discretion. *Miller v. State*, 980 So. 2d 927, 929 (Miss. 2008). We will not disturb the verdict unless it "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)).

*Neal v. State*, 15 So. 3d 388, 410 (Miss. 2009). The "evidence should be weighed in the light most favorable to the verdict." *Id.*

¶28. When there is a question whether the evidence was sufficient to support the verdict, the State is given "the benefit of all favorable inferences that may reasonably be drawn from objective facts established by the evidence." *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985) (citing *Glass v. State*, 278 So. 2d 384, 386 (Miss. 1973)). "If the facts and inferences so considered point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the

14

defendant was guilty, granting the motion [for judgment notwithstanding the verdict] is required." *Id.* (citing *May v. State*, 460 So. 2d 778, 781 (Miss. 1984)).

¶29.    In today's case, the State was required to prove the following elements beyond a reasonable doubt: (1) that defendant negligently caused the death, disfigurement, or permanent disability or destruction of "the tongue, eye, lip, nose or any other limb, organ or member of another" (2) while operating a motor vehicle under the influence of alcohol or a controlled substance which has impaired such person's ability to operate a motor vehicle. Miss. Code Ann. § 63-11-30(1)(b), (5) (Rev. 2004).

¶30.    Irby argues that Ivey's testimony that there were two sets of skid marks leading to the accident was contradicted by another officer at the scene. Contrary to Irby's contention, the testimony by the other officer, Roger Robinson, does not favor the defendant. Robinson testified that he had observed skid marks at the scene trailing from the trajectory of Olivia Miller's vehicle. This is consistent with Olivia Miller's testimony that Irby never appeared to brake prior to impact. Such evidence that Irby failed to brake supports the jury's finding that Irby was operating a motor vehicle negligently and while impaired.

¶31.    Although conceding that he was observed to be in the wrong lane of traffic, Irby argues that it was Olivia Miller's negligence, namely swerving into the wrong lane just as Irby swerved into the correct lane, that caused the accident. Irby further maintains that Olivia Miller was speeding in that she was traveling at 35-45 miles per hour in a 25-miles-per-hour zone. Moreover, Irby avers that he had no alcohol in his system and that the toxicologist's analysis regarding other substances was speculative. More specifically, Irby highlights

15

testimony from Dr. Labay regarding her "impairment statement" in the toxicology report. Dr. Labay testified as follows:

> Based on the concentration of Alprazolam and Hydrocodone found in this case, it can be stated with reasonable scientific certainty that if the individual showed signs of impairment–and examples of that we listed here include evidence of erratic driving, unusual demeanor–that these substances can be responsible for the production of that impairment, especially in the absence of a more competent cause.

Presumably, Irby takes issue with the words "substances *can* be responsible for the production of that impairment."

¶32.    This lack of evidence, according to Irby, means that the State failed to prove its requisite element of negligence for a conviction of DUI maiming; thus, the motion for judgment notwithstanding the verdict should have been granted. Lastly, Irby contends that the verdict "is so contrary to the overwhelming weight of the evidence that to allow [it] to stand would sanction an unconscionable injustice." ***Taggart v. State***, 957 So. 2d 981, 987 (Miss. 2007).

¶33.    When viewing the evidence "in the light most favorable to the verdict," ***Neal***, 15 So. 3d at 410, it is clear that the overwhelming weight of the evidence supports a guilty verdict. Olivia Miller testified that, as she drove over a hill, she saw Irby's truck in her lane driving toward her at an alarming speed. Afraid of veering into the ditch on her right, Miller swerved left just as Irby overcorrected to his right. This resulted in an impact that was not quite head-on, but at an angle. Both Miller and Ivey testified that Irby had smelled of alcohol that day, and although Irby's blood sample was not positive for the presence of alcohol, it did test

16

positive for other substances. The forensic toxicologist, Dr. Labay, testified to significant levels of alprazolam and hydrocodone in Irby's blood analysis, both of which, according to Dr. Labay, affect one's ability to operate a motor vehicle. Finally, Olivia Miller testified at length regarding her husband's permanent disability that was a direct result of the crash.

¶34. Finally, "after viewing the evidence in the light most favorable to the prosecution," it is clear that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Neal*, 15 So. 3d at 409 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Accordingly, the trial judge did not abuse his discretion in denying Irby's motion for a new trial and/or judgment notwithstanding the verdict.

## CONCLUSION

¶35. The trial court did not err in admitting the blood-analysis evidence because Irby did not properly raise the validity-of-consent issue. Secondly, the defendant had the burden to proffer evidence of diminished capacity and failed to do so. Moreover, the trial court did not err in refusing to allow defense counsel to cross-examine Ivey in the jury's presence as to whether he had intended to compel Irby to submit a blood sample, given that the State always had maintained that Irby had consented to the blood sample. Finally, the trial court did not abuse its discretion in denying Irby's motion for a new trial and/or judgment notwithstanding the verdict.

17

¶36.   Therefore, the Clarke County Circuit Court judgment of conviction for DUI maiming and sentence of twenty-five years in the custody of the Mississippi Department of Corrections entered against Thomas Irby is affirmed.

¶37.   **CONVICTION OF DUI MAIMING AND SENTENCE OF TWENTY-FIVE (25) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AS A HABITUAL OFFENDER, WITHOUT REDUCTION, SUSPENSION, PROBATION, PAROLE OR ANY OTHER TYPE EARLY RELEASE OR REDUCTION, AFFIRMED. APPELLANT SHALL PAY COURT COSTS OF $368.50, A FINE OF $1,000.00, PAY $1,000.00 AB FEE AND $3,000.00 RESTITUTION FOR JUSTIN MILLER.**

   **WALLER, C.J., GRAVES, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**