# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00737-COA

SHARINA LEE WOOTEN                                         APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE

DATE OF JUDGMENT:            06/18/2021
TRIAL JUDGE:                 HON. MICHAEL M. TAYLOR
COURT FROM WHICH APPEALED:   LINCOLN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: CASEY BONNER FARMER
DISTRICT ATTORNEY:           DEE BATES
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 09/27/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     A Lincoln County Circuit Court jury found Sharina Wooten guilty of aggravated domestic violence. The trial court sentenced her to twenty years in the custody of the Mississippi Department of Corrections, with fifteen years to serve and five years suspended, and five years of post-release supervision. On appeal, Wooten argues that the trial court abused its discretion by allowing in evidence of other prior bad acts and that her fundamental right to present a defense was denied in three instances involving trial witnesses. Finding no error, we affirm Wooten's conviction and sentence.

### FACTS AND PROCEDURAL HISTORY

¶2. On January 3, 2020, Sharina Wooten shot her boyfriend, Ernest Jordan, after an altercation at her trailer home in Bogue Chitto, Mississippi. Wooten and Jordan met in November 2019 and began living together a week later. At the time, Jordan had neither a vehicle nor a working cell phone.

¶3. Wooten and Jordan's relationship involved numerous verbal and physical altercations before the night of the shooting, including an incident where Wooten had slapped him when they were arguing about another woman. During this argument, Wooten tried to pull a gun from her purse, but Jordan got the purse and gun away from her. Both Wooten and Jordan accused the other of physical abuse and controlling behavior.

¶4. On the night of January 3, Wooten and Jordan were in Wooten's trailer home with her two teenage nieces and daughter. Wooten was talking with her nieces, and Jordan was playing games on an old cell phone in another room. Jordan testified that Wooten was discussing his and Wooten's sexual relationship with her nieces and that this upset him. Wooten testified that she and her nieces were not discussing Jordan but instead telling jokes. After the nieces left, Wooten and Jordan began arguing. Wooten claimed that the altercation became physical. Jordan, however, testified that the altercation was only verbal.

¶5. According to Jordan, he decided to leave the trailer and asked Wooten if he could use her phone to call for a ride. Wooten handed over the phone, and he stepped outside to call somebody. Wooten watched him from the doorway before walking away and then reappearing with a gun. Wooten told Jordan to "back up" and then began shooting at him.

2

Wooten shot once, then paused, and fired three more times, all missing Jordan. He turned to run away from Wooten, and she shot a fifth bullet that hit him in the back. Jordan told Wooten that she shot him and ran toward Highway 51.

¶6. Jordan used Wooten's phone to call 911, and a recording of the call was entered into evidence. Jordan, in shock and bleeding profusely, did not speak to the dispatcher, but he could be heard running and calling for help. When the call ended, Wooten pulled up to Jordan in her car on Highway 51 and asked for her phone back. Jordan recounted that Wooten was still pointing the gun at him when he approached her car. Wooten's daughter was in the back seat. Jordan gave the phone to Wooten and asked for a ride to the hospital, but Wooten drove away. Jordan then ran to the road for help.

¶7. Althea Upkins was traveling on Highway 51 when she encountered a blood-covered man in the road looking for help. Jordan jumped toward Upkins's car as she passed by him. Upkins turned around and called 911, heading back to assist Jordan. Upkins testified that Jordan locked his arms around her car's side-view mirror and would not let go, looking "scared for his life." Upkins waited with Jordan until law enforcement arrived at the scene. Jordan told Upkins his girlfriend had shot him.

¶8. Troy Moak also encountered Jordan on the side of Highway 51. Moak continued past Jordan and dropped off his children before returning to assist Jordan, who was by then on the ground in the road beside Upkins's car. Moak testified that Jordan looked scared and kept saying, "[H]elp me, help me, I'm dying and cold." Jordan told Moak that his girlfriend shot

3

him. As Upkins and Moak applied pressure to Jordan's wounds while waiting on the ambulance, Wooten drove through the scene at least once before stopping.

¶9. After retrieving her phone from Jordan, Wooten drove to her mother's house nearby, where she dropped off her daughter. Wooten's mother testified that Wooten was crying and hysterical. Wooten then returned to the scene and asked Upkins what had happened and whether Upkins had run over Jordan. Upkins and Moak both reported seeing blood on the driver's side door of Wooten's car. Moak testified that Jordan started "freaking out" when Wooten approached Jordan. Wooten tried to lift Jordan off the ground but could not. Wooten then kneeled down, and Upkins heard Wooten whisper to Jordan not to tell the police that she was the one who shot him. Upkins testified that Wooten told her Jordan had likely been hit by a stray bullet as there were frequent shootings in the area. Upkins lived nearby and testified she had never heard of any shooting.

¶10. An officer at the scene requested that Wooten move her car to make way for the ambulance. Wooten then drove to her home nearby, changed her shirt, and cleaned Jordan's blood from her car and herself before returning to the scene. At trial, Wooten denied that these actions were an attempt to hide her role in the shooting. Shortly after she returned to the scene, law enforcement realized that Wooten was the assailant Jordan had identified. An officer then instructed Wooten to stay at the scene.

¶11. Andrew Montgomery, a Lincoln County Sheriff's Department investigator, spoke with

4

Wooten at the scene. Montgomery advised Wooten of her *Miranda*[1] rights after seeing blood on her car door. Wooten informed him Jordan was her boyfriend, and they had gotten into an altercation earlier that night. Wooten claimed the altercation was only verbal and not physical. Wooten stated Jordan had walked away from her house, and she was unsure of how he had been shot. She again speculated that Jordan may have been hit by a stray bullet. Montgomery testified that Wooten was "very defensive" during questioning at the scene. Another officer who was dispatched to the scene was wearing a body camera, and its video, which was entered into evidence, corroborated that Wooten was defensive and uncooperative with law enforcement. Wooten later informed Montgomery that she did fire the gun during the altercation, but they were warning shots fired toward the road. When Montgomery spoke with Jordan, he stated Wooten first fired when he was facing her. Then, he turned and ran away from her and was struck in the back.

¶12. Wooten was transported to the sheriff's department for further questioning by Montgomery, who was aware that Jordan had identified Wooten as the one who had shot him. Montgomery also had seen the blood on Wooten's car door. During her interview, Wooten told Montgomery that Jordan had threatened her with a knife.

¶13. Law enforcement checked inside Wooten's trailer home for other victims. Montgomery testified that based on the officers' walk-through, nothing indicated that a shooting had taken place inside the home, but there were indications of an altercation.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Montgomery testified that he saw a hole in Wooten's wall and an overturned clothes rack. Officers searched Wooten's vehicle and discovered a .380-caliber semi-automatic handgun under the passenger's seat. The casings on the scene matched the handgun's caliber.

¶14. Montgomery took photographs of Wooten's face that were entered into evidence to show there were no visible injuries on her. Wooten, however, testified these photographs were mug shots and did not document her lack of bruising. Wooten did not inform Montgomery of any injuries on the night of the shooting.

¶15. Wooten's ex-husband, John, testified for the State over a continuing objection by the defense, which had filed a motion in limine to exclude Wooten's prior bad acts under Mississippi Rule of Evidence 404(b). During trial, the parties had an in-chambers hearing on the motion. Defense counsel argued against the State's eliciting testimony from John about two incidents: a stabbing and a threat of assault during their marriage, both occurring about thirteen years previously. The State argued that this evidence was admissible because it would contradict Wooten's anticipated testimony that the shooting was an accident—she previously had acted violently toward a prior domestic partner. The defense countered that the testimony would be more prejudicial than probative. The trial court found the testimony probative on the issue of lack of mistake, accident, or self-defense;[2] further, the court found the testimony's probative value substantially outweighed any prejudicial effect.[3] The trial

---

[2] Lack of self-defense is not an enumerated exception in Rule 404(b)(2).

[3] In this finding, the trial court inverted the burden of Rule 403, but for purposes of this opinion the error does not change our disposition. Rule 403 states the trial court "may

court informed the defense that it would be entitled to a limiting instruction on the evidence and warned the State that there should be no suggestion that the testimony was being offered for any other uses than those permitted under Rule 404(b)(2).[4]

¶16.    John proceeded to testify that he and Wooten married in 2006 and divorced in October 2020.  They were separated for "a long time."  He testified that during the marriage, there were multiple physical domestic altercations between him and Wooten: in one altercation about a year into the marriage, Wooten stabbed him; another time, Wooten ran her car into his in a hospital parking lot after a fight.  At times, John feared for his safety during the marriage, but he described their relationship as "give and take," explaining that they both had a part in the altercations.  On cross-examination, John denied having an ulterior motive for testifying, such as to gain custody of their child if Wooten were convicted; he had been subpoenaed to testify and did not want to take part in Wooten's trial for fear that it would alienate his child.

¶17.    Wooten testified in her own defense.  She claimed that Jordan was the aggressor on the night of the shooting and that she was acting in self-defense.  According to Wooten,

---

exclude relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice."  M.R.E. 403.

[4] Before the defense rested, defense counsel made an oral motion for a new trial, renewing his objection to the introduction of prior bad acts under Rule 404(b).  He argued that *Johnson v. State*, 204 So. 3d 763 (Miss. 2016), was distinguishable, *see infra* ¶23, and that the stabbing was too remote, prejudicing Wooten to the extent that her right to a fair trial was violated.  The trial judge overruled the motion for the same reasons as he denied the motion in limine, but he also found the testimony was not improperly used by the State.

Jordan confronted her after her nieces left, and a physical altercation ensued. Wooten claimed that Jordan took her cell phone from her and took it outside so that she could not call for help. Wooten also testified that during their altercation, Jordan had threatened her with a kitchen knife, thrown her against a wall, and punched her. Wooten claimed that while attempting to escape from Jordan and get into her car with her daughter, she fired several warning shots in quick succession. Wooten testified she was scared for her life; she jumped in the car and took off, and Jordan ran away. Wooten dropped her daughter off at her mother's house and returned to "make sure [she had not] hurt anyone." Wooten testified that she saw Jordan lying in the middle of the road and thought that Upkins had run over him because there was blood on her car and on him. Wooten testified that she did not realize Jordan was shot. She tried to lift him to take him to the hospital but was told not to move him by a police officer. Wooten also denied whispering to Jordan not to tell officers she had shot him. During cross-examination, Wooten contradictorily testified that she "did not shoot [Jordan] for absolutely no reason, and I did not shoot him on purpose." The day after her arrest, Wooten filed a domestic violence complaint against Jordan but claimed it was never investigated.

## ANALYSIS

### I.     Admission of Prior Bad-Acts Evidence

¶18.    Wooten argues that the trial court erred in allowing Wooten's ex-husband, John, to testify that Wooten had stabbed him during a fight. She claims that the evidence was

8

inadmissible because it was used to show lack of self-defense, which is not an exception found under Mississippi Rule of Evidence 404(b)(2).

¶19.    The admission or exclusion of evidence is reviewed for an abuse of discretion. *Boggs v. State*, 188 So. 3d 515, 519 (¶9) (Miss. 2016). "Evidentiary rulings are affirmed unless they affect a substantial right of the complaining party." *Id.* (quoting *Sewell v. State*, 721 So. 2d 129, 138 (¶50) (Miss. 1998)). Generally, Rule 404(b) prohibits "[e]vidence of a crime, wrong, or other act" used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R.E. 404(b)(1). However, this evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2). When evaluating whether to admit evidence of other crimes, wrongs, or acts, a two-part analysis is applied. *Johnson v. State*, 204 So. 3d 763, 768 (¶15) (Miss. 2016). First, the evidence must not be offered to prove a person acted in conformity to an alleged character trait, as prohibited by Rule 404(b)(1). *Johnson*, 204 So. 3d at 768 (¶15). Second, the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice toward the defendant under Mississippi Rule of Evidence 403. *Id.* The second prong allows otherwise relevant evidence to be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403.

¶20.    The trial court found John's testimony about "prior bad acts" admissible under Rule

9

404(b) to show that the shooting was not an accident or mistake—Wooten previously had acted violently during altercations with a domestic partner. Further, the trial court found the testimony's probative value substantially outweighed its prejudicial effect under Rule 403.[5]

¶21. John's testimony was brief. He told the length of his marriage to Wooten and said there were numerous physical domestic altercations. He testified about two incidents but gave few details: one where Wooten stabbed him when they were married and another where she ran into his car in a hospital parking lot after a fight. John also admitted both of them were to blame for their altercations (i.e., it was "give and take"). Further, he was subpoenaed and testified he did not want to be at Wooten's trial, thus having no ulterior motive in testifying.

¶22. Wooten's argument on appeal focuses on John's testimony about the stabbing. She claims that the trial court erred in allowing the testimony because the stabbing was only an accusation, not a conviction; there was no proof the stabbing actually happened, and Wooten had not been convicted of any crime. Wooten also argues the incident was too remote, occurring more than ten years before Wooten allegedly shot Jordan. Further, she asserts her defense was self-defense, not an accident or mistake.

¶23. During the in-chambers hearing on the motion in limine, the State cited as applicable the Mississippi Supreme Court's opinion in *Johnson*, and the trial judge found it instructive. In *Johnson*, a defendant was convicted of aggravated domestic violence by strangulation

---

[5] *See supra* note 3.

against his ex-wife. *Johnson*, 204 So. 3d at 766 (¶3). He claimed his actions were taken in self-defense. *Id.* at (¶4). The defense filed a motion in limine to prevent the State from introducing prior domestic-violence cases against Johnson. *Id.* The State provided four prior offense reports involving domestic violence by Johnson: (1) a thirteen-year-old offense report showing Johnson pleaded guilty to simple assault against one of his ex-wives where he went to her home and threatened to kill her with a gun; (2) an undated offense report indicating Johnson pleaded guilty to simple assault against a girlfriend where he went to her workplace and threatened her; (3) a ten-year-old offense report showing charges (later dropped) against Johnson for simple assault of Volante Jones showing various injuries on her; and (4) a current offense report detailing an assault of Johnson's daughter, which was retired to the file after he completed an anger-management course. *Id.* at 766-67 (¶8). The trial court allowed in all four reports under Rule 404(b) and Rule 403. *Id.* at 767 (¶10). The supreme court found the trial court did not abuse its discretion in admitting the reports under Rule 404(b) because the prior acts showed "intent, motive, and plan," and "the domestic violence was not in self-defense."[6] *Id.* at 769 (¶17). The trial court explained that the acts were all against women with whom he had a prior relationship where he was the aggressor and initiated the

---

[6] The trial court had also found the reports admissible because the domestic violence was not in self-defense. *Id.* at 769 (¶17). In the case before us, the trial judge noted that in *Johnson* the supreme court apparently inserted lack of self-defense as an exception in Rule 404(b)(2).

11

assaults. *Id.* The supreme court also found that the trial court properly applied Rule 403,[7] finding all four prior offenses probative because they were "very serious and akin to what happened in this case. . . ." *Id.* at 770 (¶19).

¶24. Wooten argues that *Johnson* is not applicable. She claims that even though two of the offenses admitted in *Johnson* were remote in time, they were part of a history that evinced a pattern and a clear indication of intent. Here, Wooten argues there were no subsequent incidents to form a link between the stabbing thirteen years ago and the shooting. Further, Wooten interprets the supreme court as having found lack of self-defense as an additional, unenumerated exception in Rule 404(b)(2); however, she claims John's testimony supports rather than rebuts lack of self-defense because of the "give and take" nature of their fights. Finally, Wooten complains that the trial court allowed a "criminal affidavit" to be admitted, which she maintains was merely an accusation and not a conviction.[8]

¶25. Wooten's arguments are not persuasive. Here, the stabbing occurred thirteen years

---

[7] Initially, this Court had reversed and remanded the case, holding that the trial court had erred in admitting the evidence of prior bad acts because the trial court had failed to conduct a proper balancing test under Rule 403. *Id.* at 765 (¶1); *see Johnson v. State*, 204 So. 3d 817, 826 (¶38) (Miss. Ct. App. 2015). The Mississippi Supreme Court reversed, finding this Court erred in holding that the trial court did not consider the facts in the offense reports. *Johnson*, 204 So. 3d at 765 (¶1).

[8] Wooten also complains that the criminal affidavit refers to another unrelated crime of writing a bad check, further prejudicing her. However, upon our examination of the exhibit, the document appears to be just one printed-out computerized "record" for the crime of "aggravated assault domestic violence." The phrase "bad check amount" looks as if it is part of the form, just above "jail time," and not another crime. Even so, Wooten did not raise this argument before the trial court; thus, it is waived. *See Walker v. State*, 913 So. 2d 198, 227 (¶96) (Miss. 2005).

before Wooten's trial. In *Johnson*, the first and third offenses occurred thirteen and ten years before the assault at issue. *Id.* at 766-67 (¶8). Remoteness is considered under Rule 403 if the evidence of bad acts is found admissible under Rule 404(b). *May v. State*, 524 So. 2d 957, 965 (Miss. 1988). Here, the trial judge considered the remoteness of John's allegation and still found that even though it occurred thirteen years ago, under *Johnson* it was probative to show Wooten's lack of mistake, lack of accident, or lack of self-defense. She previously had reacted violently during an altercation with a domestic partner and injured him with a deadly weapon. Further, Wooten's claim of self-defense does not preclude the jury from considering that the shooting was an accident or mistake. In addition to claiming self-defense, Wooten also testified that she did not shoot Jordan on purpose—she shot blindly, only meant to scare him, and initially did not know she had hit him.

¶26. Additionally, the trial court did not err in admitting an accusation of a bad act and not a conviction. Rule 404(b)(1) involves a "crime, wrong, or other act," which would include accusations; there is no requirement the prior "bad act" must have been a conviction. In *Johnson*, only two of the admitted offense reports included convictions; the other two were only charges, and one was retired to the file. *Johnson*, 204 So. 3d at 766-67 (¶8). In overruling the motion for a new trial, the trial judge correctly found the State did not improperly use the testimony. The jury was instructed that they could not consider Wooten's past "act of domestic violence against John" as evidence of her current guilt. A limiting instruction was given to the jury, explaining that they could only consider the prior assault

13

of John "for the limited purpose of proving an absence of accident or mistake" by Wooten allegedly assaulting Jordan.

¶27. Moreover, even if the trial court had improperly admitted the evidence, the error would not warrant reversal. *See Stone v. State*, 94 So. 3d 1078, 1086 (¶21) (Miss. 2012) (The supreme court affirmed an aggravated assault conviction, finding that the trial court did not err in admitting evidence of defendant's prior history of threats and violence against victim, and even if improperly admitted, reversal was not required because the evidence against the defendant was overwhelming.). "[The] trial judge enjoys a considerable amount of discretion as to the relevancy and admissibility of evidence. Unless this judicial discretion is so abused as to be prejudicial to the accused, [the appellate court] will not reverse [the trial court's] ruling." *Id.* (quoting *Irby v. State*, 49 So. 3d 94, 100 (¶16) (Miss. 2010)). Further, "[a]n error does not require reversal 'when it is apparent on the face of the record that a fair minded jury could have arrived at no other verdict than that of guilty.'" *Id.* (quoting *Forrest v. State*, 335 So. 2d 900, 903 (Miss. 1976)).

¶28. Here, the evidence presented at trial of Wooten's guilt was considerable. Both Wooten and Jordan admitted their relationship was turbulent. Both individuals corroborated the events leading up to the shooting. On the scene, Upkins and Moak both testified that Jordan said that Wooten had shot him and that he was scared for his life. Upkins testified that on the scene, Wooten did not admit to being the one who had shot Jordan. Instead, Wooten asked her what happened to Jordan and speculated that he was hit by a stray bullet.

14

Further, Upkins overheard Wooten tell Jordan, who was lying in the road and bleeding, not to tell officers that she had shot him. Testimony from several witnesses showed Wooten's trying to cover up her involvement in the shooting by going home to change clothes and wipe blood off her car. At the scene, Wooten was defensive and uncooperative with law enforcement according to testimony and the body camera video. Her lack of concern for Jordan was evidenced by her driving away when Jordan asked her to take him to the hospital, later driving through the scene without assisting him while Upkins and Moak tried to stop his bleeding, and attempting to lift Jordan into her car instead of waiting for an ambulance. Moreover, Wooten could not provide any evidence of physical injuries to support her claim of self-defense. Finally, a jury could find Jordan's version of events was credible, while Wooten's version was inconsistent and not credible. Wooten both admitted she shot Jordan and testified that she did not realize Jordan had been shot; she initially thought Upkins had run over Jordan. Wooten also inconsistently testified that she blindly fired several warning shots toward the road, that the shooting was in self-defense, and that it was an accident. A fair-minded jury could have found no other verdict than guilty.

¶29.    In conclusion, the trial court did not abuse its discretion in admitting John's testimony of Wooten's prior bad act. Further, even if the evidence were admitted in error, we could not find that the admission prejudiced Wooten to such an extent that reversal and a new trial are necessary.

**II.    Witnesses**

15

¶30. Wooten claims that she was denied her fundamental right to present a defense. She cites three instances involving witnesses where this right was allegedly denied: (1) the denial of her motion to continue so she could secure the presence of defense witness Charlotte Smith; (2) the exclusion of hearsay testimony from defense witness Lakesha Smith; and (3) the absence of subpoenaed defense witness Antoinette Pryor. We acknowledge "[f]ew rights are more fundamental than that of an accused to present witnesses in [her] own defense." *Williams v. State*, 174 So. 3d 275, 281 (¶31) (Miss. Ct. App. 2014) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). However, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* We shall discuss each instance in turn.

### A. Charlotte Smith

¶31. The trial judge has broad discretion in granting or denying a motion for a continuance: "[t]he granting of a continuance is largely within the sound discretion of the trial court, and a judgment will not be reversed because the continuance is refused unless there has been an abuse of that sound discretion." *Casey v. State*, 256 So. 3d 596, 599 (¶10) (Miss. Ct. App. 2018) (quoting *Hardiman v. State*, 776 So. 2d 723, 727 (¶19) (Miss. Ct. App. 2000)).

¶32. Wooten argues that the trial court abused its discretion in denying her motion to continue the trial because the court denied her of the right to present defense witness

16

Charlotte Smith.[9] The defense filed the motion two days before trial, on May 17, 2021. The day before trial, defense counsel argued before the judge that the defense had been unable to serve Charlotte, a material witness, with her subpoena because "she works in another part of the state," and they had been unable to contact her. Counsel acknowledged that the defense had received a previous continuance in the last trial term (two months earlier) for the failure to secure Charlotte's presence. The defense proffered Charlotte's expected testimony—that Jordan was "extremely controlling" of Wooten, that he would take her phone as a means of control, that she had heard Jordan tell Wooten that "no one else could have her," and that he had threatened to kill Wooten sometime in November or December of 2019.

¶33. The trial court denied the motion, noting that the defense had failed to request the trial court to use its "considerable powers" to help procure Charlotte's attendance beyond filing the motions to continue. The defense offered no explanation as to why this continuance would produce a result different from the previously unsuccessful continuance, why her testimony was so crucial, or why it had seemed so difficult to serve her. We conclude that the trial court acted within its discretion in denying the May 2021 motion to continue.

### B.     Lakesha Smith

¶34. Wooten argues that the trial court erred in sustaining the State's objection to

---

[9] Defense witness Lakesha Smith was also cited as another reason to continue the trial. Unlike Charlotte, Lakesha had been served with a subpoena but informed the defense that she would be unable to testify for work reasons. The trial court responded that it would secure Lakesha's attendance.

Lakesha's testimony. At trial, defense counsel asked Lakesha, "[W]hat, if any, threats did you hear [Jordan] make to [Wooten]?" The State objected, and defense counsel explained to the trial judge he was trying to elicit that Jordan had threatened Wooten a month before the shooting.

¶35. Wooten claims she should have been allowed to explain her state of mind at the time of the shooting through Lakesha's testimony. However, Wooten failed to explain how this testimony, a month before the shooting, could explain her state of mind during the shooting. Further, the testimony was not proffered to preserve the point for appeal. "When testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Green v. State*, 89 So. 3d 543, 554 (¶28) (Miss. 2012) (quoting *Metcalf v. State*, 629 So. 2d 558, 567 (Miss. 1993)). Because Wooten did not proffer Lakesha's testimony, Wooten has waived any assignment of error.

### C. Antoinette Pryor

¶36. Wooten also contends that she could not present her defense because a subpoenaed witness, Antoinette Pryor, left the courthouse before being called to testify, and the trial court erred in not enforcing the subpoena. We disagree.

¶37. "[A] criminal defendant has a constitutional right to invoke the 'compulsory process' of the State 'for obtaining witnesses in [her] favor.'" *Gilmore v. State*, 772 So. 2d 1095, 1100 (¶17) (Miss. Ct. App. 2000) (quoting U.S. Const. amend. VI). Yet while the trial court has the power to enforce subpoenas, it is "the defense's duty to diligently pursue the presence

of the witness. . . ." *Id.* (quoting *King v. State*, 251 Miss. 161, 168 So. 2d 637, 641 (1964)).

¶38.    In *Gilmore*, a similar situation occurred.  The defense issued subpoenas for three alleged alibi witnesses who appeared at the courthouse but left mid-trial, before they testified, and did not return.  *Id.* at 1100 (¶15).  The defense did not request the trial court to enforce the subpoenas and did not request a continuance.  *Id.* at (¶17).  This Court held that "[b]y resting without pursuing any further effort to procure the presence of these absent witnesses, we are satisfied that the defense waived any right to complain based on the allegation that these supposed alibi witnesses apparently chose to disregard the subpoenas issued for them." *Id.*

¶39.    *Gilmore* is instructive.  Here, the trial judge offered to issue a bench warrant for Pryor, but Wooten's counsel did not accept this offer.  Wooten seems to suggest that the trial court, of its own accord, should have sent law enforcement to obtain Pryor's presence, but she offers no authority for this contention.  Further, the defense rested without taking any additional action to secure Pryor's presence to testify.  Therefore, under *Gilmore*, the defense waived its right to complain.  Moreover, like Lakesha's testimony, Pryor's testimony was not proffered to preserve the point for appeal; therefore, any assignment of error was waived.

¶40.    **AFFIRMED.**

**CARLTON, P.J., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WILSON, P.J., AND WESTBROOKS, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**